Commonwealth *v.* Dauphinee et al., Appellants.

Argued December 13, 1935.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Francis B. Bracken,* for appellant, Harris.

*Bryan A. Hermes,* for appellant, Conro.

*William A. Gray,* for appellant, Dauphinee.

*Earl Jay Gratz,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

OPINION BY CUNNINGHAM, J., March 16, 1936:

The forty-four appeals now before us were taken by the three appellants from the separate sentences pronounced against them in the court below upon their convictions under twenty-three indictments, charging them with numerous violations of our statutes defining, and prescribing the punishment for, certain offenses when committed by officers or employees of banks or trust companies.

As the indictments were consolidated for trial, and as certain identical and fundamental questions are involved under each appeal, it will be possible, by making appropriate classifications of the indictments, to dispose of these numerous appeals in one opinion.

When the Franklin Trust Company of Philadelphia closed its doors on October 5, 1931, C. Addison Harris, Jr., appellant in fifteen of the above appeals, was, and for many years had been, its president; Arthur B. Dauphinee, appellant in sixteen appeals, was its vice-president; and Edwin C. Conro, appellant in thirteen appeals, its treasurer.

At the September, November and December Sessions, 1933, and the July Sessions, 1934, of the court below, twenty-seven indictments were returned against them, in which they were charged, in some instances singly and in others jointly and sometimes as principals and at other times as aiders and abettors, with the embezzlement, abstraction and willful misapplication of the funds of the trust company, within the meaning of the Act of April 23, 1909, P. L. 169, as amended by the Act of April 16, 1929, P. L. 524, 18 PS §2516, and with the fraudulent conversion thereof, contrary to Section 116 of the Penal Code of March 31, 1860, P. L. 382, as amended by the Act of June 12, 1878, P. L. 196, 18 PS § 2511.

Dauphinee and Conro were jointly charged with making false entries in the books of the trust company, contrary to the acts of 1929, and 1878, supra, and Conro, with making a false report to the Secretary of Banking.

At the conclusion of the testimony, the learned trial judge directed verdicts of acquittal upon four of the indictments—No. 1009 September Sessions, and Nos. 837, 952 and 954, December Sessions, 1933—and also directed that Conro be acquitted upon the first count of the false report indictment against him at No. 1213 July Sessions, 1934.

At this point it may be noted that Conro was not convicted of embezzlement, abstraction or fraudulent conversion, but was convicted, both as a principal and as an aider and abettor, of numerous misapplications of the funds of the bank, and was convicted alone of making a false report (under the second count at No. 1213 July Sessions, 1934); he was also convicted along with Dauphinee at No. 1010 September Sessions, 1933, of making false entries in the books of the company. His acquittal of embezzlement and conversion was directed at No. 953 December Sessions, 1933. Conro was sentenced at No. 1183 November Sessions, 1933, upon his conviction of having misapplied an item of $5,950, (hereinafter referred to as the Charles W. Paris transaction) to serve a sentence of not less than two and one half or more than five years in the Philadelphia County prison, and at No. 1013 December Sessions, 1933, where he was convicted of a similar misapplication of the sum of $11,275, (referred to as the Aurelio Fabiani transaction), he was also sentenced to not less than two and one-half or more than five years to begin at the expiration of his sentence at No. 1183. His sentences, to the same terms, upon his conviction at No. 1010 September Sessions, 1933, for making false entries and for nine additional misapplications were directed to run concurrently with the foregoing principal sentences.

Harris was convicted, both as a principal and as an aider and abettor, of embezzlements and willful misapplications under the Act of 1929, and of fraudulent conversions under the Act of 1878. At No. 833 December Sessions, 1933, where he was convicted of embezzlement and fraudulent conversion of an item of $45,000, (referred to as the Martin E. Greenhouse transaction), he was sentenced to imprisonment for not less than two and one-half or more than five years; and at No. 830 of the same term, where he was convicted of misapplication of an item of $3,000, he was sentenced to an additional term of from two and one-half to five years, and similar concurrent sentences were imposed at thirteen other numbers.

Dauphinee was sentenced at No. 949 December Sessions, 1933, upon his conviction of embezzlement, willful misapplication and fraudulent conversion of items of $50,264 and $6,235, (referred to as the Hoffman-Henon transaction) to not less than two and one-half or more than five years. At No. 835, where he was convicted of the same offenses in connection with one of the Greenhouse transactions, he was given an additional term of not less than two and one-half or more than five years; at fourteen other numbers he was sentenced to like terms to run concurrently with his principal sentences. The net result, therefore, was a sentence of from five to ten years for each appellant.

The indictments, and convictions thereunder, divide themselves into three classes: First, convictions of all three appellants of willful misapplications based upon the sale to customers of the bank of several thousand shares of Franklin Trust Company stock, designated throughout the trial as "syndicate stock"; Second, convictions of Harris and Dauphinee of embezzlements, misapplications and fraudulent conversions, through sales of a number of shares of their own stock in the company; and Third, convictions of Dauphinee and

Conro for making false entries and of Conro alone for making a false report.

### 1. Sales of Syndicate Stock.

The indictments, convictions of willful misapplications and sentences, included under this classification were at Nos. 1183 and 1184, November Sessions, 1933; Nos. 830-832, 838 and 839, 950 and 951, 955 and 956, and 1012-1015, December Sessions, 1933, of the court below.

The criminal offenses here involved are alleged willful misapplications of the funds of the bank, within the intendment of the Act of April 16, 1929, P. L. 524. Dauphinee and Conro were the principal actors in the transactions upon which the above indictments were based, but Harris was also charged with and convicted of having aided and abetted them. The applicable portions of the statute read:

"That any president, vice-president, cashier, treasurer, secretary, teller, bookkeeper, clerk, employee or agent of any ...... trust company, title insurance company, surety company, or safe deposit company, incorporated under the laws of this commonwealth; ...... who shall *embezzle, abstract* or *willfully misapply* any of the moneys, funds, or credits of any of said institutions, ...... or who shall make any *false entry* in any book, report, or statement of such institution, with intent in either case, to injure or defraud such institution or any other company, body politic or corporate, or any individual person, or to deceive any officer of such institution, or any bank examiner or other person legally authorized to examine the affairs of any such institution; ...... and any person who, with like intent, aids or abets any president, vice-president, cashier, treasurer, secretary, director, trustee, teller, bookkeeper, clerk, employee, or agent of such institution, in any violation of this act, shall be deemed guilty of a misdemeanor."
(Italics supplied)

This portion of our statute is in substantially the same language as Section 5209 of the Revised Statutes of the United States, applicable to the officers, etc., of national banking associations: 12 U. S. C. A. tit. 12, Sec. 592.

The material facts relative to the organization of a syndicate, (of which thirteen out of fourteen directors of the company, including appellants, were members) and the purchasing and selling of Franklin Trust Company stock by that syndicate were not in controversy at the trial.

It was formed in November, 1929, in order to purchase Franklin Trust Company stock from time to time as shares could be obtained and to then sell the stock at prices controlled by the syndicate. The syndicate borrowed funds from the bank to purchase shares whenever offered. Its members put up no funds of their own, but (with the exception of Conro) each signed a personal guarantee in the amount of $45,000 to the trust company, for all loans made to the syndicate. Conro, who did not become a member until after the syndicate had been formed, gave his guarantee in the sum of $15,000. These guarantees were kept in Harris' filing cabinet. The sales by the syndicate with which we are concerned in these cases were made to depositors and customers of the bank, who, in turn, borrowed from it the respective amounts necessary to pay for the shares each agreed to buy.

We find this description of the organization and operations of the syndicate in a portion of the charge to which counsel for appellants take no exception:

"After the stock market collapse of September and October, 1929, the values of bank shares declined, and with them the shares of the Franklin Trust Company. On November 2, 1929, the syndicate was formed, comprising officers and directors of the trust company. As to the purposes that the syndicate set out to achieve

there is a conflict of opinion between the commonwealth and the defendants. The defendants urged that the syndicate was formed in order to save injury to the bank and its depositors, or as Harris put it, to permit an orderly decline in the market price of the stock. The syndicate was an informal arrangement, and according to the defense, usually held a meeting after the regular meeting of the board of directors. Harris acted as the syndicate manager, the account at the bank was in his name as such, and all loans for the syndicate were also made by him. Dauphinee appeared to have been the detail man, and checked and kept the record of syndicate transactions in the black book that always remained in his possession and which has been produced here. Conro, as you have already noted, was engaged in the sale of the syndicate stock to depositors. There was no denial by the defendants of their knowledge of the syndicate transactions."

The evidence disclosed that Dauphinee conducted the negotiations under which Leon H. Greenhouse purchased 100 shares of the syndicate stock for $3,000; Robert H. Gunnis, 200 shares for $11,750; and Frank P. Croft, 1000 shares for $59,500.

Conro sold Leon A. Dubois 50 shares for $2,975; William T. Rose, 100 shares for $5,000; Charles W. Paris, (above mentioned) 100 shares for $5,950; Harry M. Shapiro, 200 shares for $11,450; A. Harrison Kosove, 100 shares for $5,125; and Aurelio Fabiani, (also above mentioned) 200 shares for $11,275.

In each instance, except in the sale to Croft, a loan of sufficient funds to consummate the purchase was made by the bank to the purchaser; none of the certificates of stock were delivered to the purchasers but were endorsed in blank and retained in the loan department of the bank and listed in a book referred to as the "side collateral book." The purchasers testified they did not know the shares acquired by them were syndicate stock

but were told by Conro or Dauphinee, respectively, that the bank would carry the loan and hold the stock as collateral.

The Croft transaction differed in that the bank held as security for a loan to the Croft and Allen Company a certificate of deposit in the amount of $100,000 which had been pledged by Croft individually to secure the indebtedness of his company. The funds with which to pay the $59,500 for the 1000 shares of stock purchased by Croft were not borrowed from the bank but were deducted from the amount of the certificate of deposit and a new certificate issued for the balance—$40,500. This new certificate and the shares purchased were retained by the bank in its collateral department. The proceeds of these various sales of syndicate stock were deposited in the account of Harris, as syndicate manager, and were applied either to the repayment of the money borrowed from the bank by the syndicate or were used to purchase stock for the syndicate.

The serious and underlying questions with which we must deal upon this branch of the case relate to the manner in which the facts we have recited were submitted to the jury by the learned trial judge and to his apparent conception of what would be sufficient to constitute the crime of "misapplication" of the funds of a bank by its officers.

Undoubtedly, the lending of the funds of the bank upon the security of shares of its own capital stock was in violation of the provisions of the second section of the Act of June 14, 1901, P. L. 561, 7 PS § 132, passed, inter alia, for the purpose of "prohibiting loans upon the security of the capital stock" of such corporations as Franklin Trust Company.[1]

---

[1] "No corporation under this act shall take as security for any loan or discount, a lien on any part of its capital stock; but the same surety both in kind and amount shall be required of persons, shareholders and not shareholders; and no such corporation shall be the holder or purchaser of any of its capital, unless such

A similar prohibition with respect to national banking associations is found in section 5201 of the Revised Statutes of the United States, 12 U.S.C.A. tit. 12, §83, by which they are forbidden to make "any loan or discount on the security of the shares" of their own capital stock. No penalty is prescribed for a violation of the act of 1901. The legislative intent apparently was that infractions of its prohibitions were to be corrected by proceedings under Section 18 of the Act of June 15, 1923, P. L. 809, 7 PS § 18, then in force.

One of the vital questions in this case is whether the above described violation of the act of 1901, amounted, in and of itself, to a "misapplication" of the funds of the bank, within the meaning of our highly penal statute of 1929.

The attitude of the trial judge upon this question was indicated in his general charge and by his refusal of certain points submitted in behalf of appellants. In the course of his charge, after quoting from the act of 1901, supra, he said: "It follows that, since the corporation can only act through its officers they are prohibited by this act from making loans upon the security of its capital stock. Any loans of the funds of the Franklin Trust Company made by any of its officers wherein the shares of the trust company were taken as collateral, or as side collateral, or as additional security, being prohibited by this act, [were] wrongful, and to such extent, constituted a misapplication of the bank's funds."

At another place the jury was told: "If you find from the evidence, in each of these transactions that the

purchase shall be necessary to prevent loss on a debt previously contracted in good faith, on surety which at the time was deemed adequate for the payment of such debt, without a lien upon such stock, or in case of forfeiture of such stock for the nonpayment of installments due thereon; and the stock so purchased shall, in no case, be held by the corporation so purchasing for a longer period than six months, if the same can be sold for what such stock cost the corporation."

loans to the purchasers of the stock were made in part or in whole on the security of the bank's stock, then there is a misapplication of the bank's funds. If on the other hand you find that the loans were not made on the security of the stock, then there is no such misapplication." These instructions were specifically excepted to and are assigned for error in the 57th and 62d assignments.

The following points for charge submitted by Dauphinee were refused, as were also identical instructions requested on behalf of Conro and Harris:

"75. It is not a crime for the officers of a bank or trust company such as the Franklin Trust Company to loan the bank's money and to take as security therefor, in whole or in part, shares of its own capital stock." Also, "77. The fact that any of the defendants, acting as officers of the Franklin Trust Company, made loans to persons, firms or corporations for the purpose of enabling such persons, firms, or corporations, to purchase shares of stock of the Franklin Trust Company is not of itself sufficient to sustain any of the indictments in this case." Assignments Nos. 71 and 73 are based upon the refusal to charge as requested in these points.

The act of 1929 covers, and the indictments now under consideration charged appellants with the commission of, three distinct and separate criminal offenses— "embezzlement," "abstraction" and "willful misapplication" of funds of the bank.

As we read this record, the jurors, in the instructions above quoted, were told that the mere making of such a loan "in part or in whole on the security of the bank's stock" amounted, in and of itself, to a criminal misapplication of the bank's funds, within the meaning of that act. As there was no denial upon the part of appellants that the loans had been intentionally and deliberately so made, the instruction seems to us to have been tantamount to a direction to find them guilty of misapplica-

tion, if the jurors believed the appellants' own testimony. That the jury so understood the instruction is indicated by the fact that the verdicts upon each of the indictments we are now considering found appellants not guilty of embezzlement but guilty of misapplication.

A specific reference to the indictments based upon the sale of 100 shares to William T. Rose on August 7, 1930, for $5,000, and to the verdicts thereon, will illustrate what occurred. The indictment at No. 950 December Sessions, 1933, (66a) contained two counts. In the first, it was charged that Dauphinee and Conro on August 7, 1930, did "unlawfully embezzle, take, convert and apply to and for their own use and benefit" $5,000 of the "moneys and property" of the trust company—substantially the language of the act of 1878. The second count charged that they did "embezzle, abstract and willfully misapply" the same money—an offense under the act of 1929. The verdict rendered upon this indictment (974a) was, "Not guilty of embezzlement; guilty of misapplication."

In the indictment at No. 956 it was charged in the first count that Dauphinee and Conro embezzled, abstracted and willfully misapplied the $5,000, and in the second that Harris aided and abetted them "to unlawfully embezzle, abstract and willfully misapply said moneys, funds and credits." (957a) The verdict under this indictment (974a) was, "Guilty of aiding and abetting in misapplication; not guilty [of] aiding and abetting in embezzlement."

We are, therefore, forced to the conclusion that the jury understood that if they were satisfied from the evidence merely that the respective loans were made and the shares of stock purchased with the money thus loaned were held by the bank as security for the loans, they would be justified in convicting appellants of the crime of misapplication.

Our understanding of the view taken by the trial

judge of the relation between the acts of 1901 and 1929 seems to be confirmed by his refusal to charge, as requested in the above quoted points, that it is not a crime for officers of a bank "to loan the bank's money and to take as security therefor, in whole or in part, shares of its own capital stock," and by his declination to say to the jury that the fact that appellants made loans for the purpose of enabling customers to purchase shares of stock of the trust company was not "of itself sufficient" to sustain any of the charges against them. Again, in his opinion refusing a new trial, he quoted the act of 1901 and reiterated his position that loans of the funds of the bank made by any of its officers, "wherein the shares of the trust company were taken as collateral, or as side collateral, or as additional security," constituted a misapplication of the bank's funds, because such loans, being "prohibited" by that act, were "wrongful."

After quoting the act of 1929, and referring to the argument in behalf of appellants that as the promissory notes given for the loans were not strictly collateral notes the loans were not made with the stock of the bank as security, the opinion proceeds: "However, it was not controverted that the bank maintained what was known as 'a side collateral' book, in which was entered a list of all the shares of stock that were pledged for security for the promissory notes. The certificates for the shares of stock were duly endorsed in blank and held in the collateral loan department of the institution, so that in effect the loans were unquestionably made upon the basis of the stock collateral. It would seem, therefore, that the defense of those charged with the crimes of conversion, abstraction, misapplication and embezzlement, with the exception of the question of fraudulent intent, was tantamount to an admission of guilt."

We are now concerned only with the crime of misapplication and cannot agree with the position thus taken

578

by the trial judge that the acts of appellants in making these loans, in violation of the prohibition of the act of 1901, were acts which in and of themselves amounted to the crime of willful "misapplication," as defined by, and made punishable under, the act of 1929. That the acts of the appellants in connection with these loans amounted to maladministration by them of the affairs of the bank of which they were officers cannot be doubted, but it does not follow that proof, or the admission, of such acts alone is sufficient to sustain a conviction of the criminal charge of misapplying funds.

The "misapplication" specified as one of the three distinct offenses (U. S. v. Lee, 12 Fed. 816 (C. C., N. Y.) ) included in the act of 1929 does not include every wrongful application. Willful misapplication, as the term is there used, means a misapplication made knowingly and designedly by an officer of a bank for his own use and benefit, or that of some person or persons other than the bank, and with intent to injure or defraud it. Criminality of some sort is implied by the use of the word and must be shown in order to sustain a conviction. It is not necessary to show that the funds were ever in the actual possession, control or custody, of the accused or that he derived any definite personal benefit from their misapplication. On the other hand, "embezzlement," as that word is used in the act, is intended to describe a species of larceny by an officer or employee of a bank and the conversion of funds, lawfully in his custody or control, to his own or another's use, with intent to injure or defraud the bank. Of course the custody or possession need not be exclusive, but the crime of embezzlement involves two general elements— a breach of trust or duty in respect to funds lawfully in a party's control but belonging to another, and the wrongful appropriation thereof to his own use.

We think "abstraction" is to be understood in the popular sense of the word and as the act of one who,

with intent to injure or defraud a bank, takes or withdraws from it any of its funds and converts them to his own or another's use. Previous lawful custody is not a technical element in either abstraction or misapplication. Although embezzlement includes both abstraction and misapplication, either of the latter offenses may be committed without committing the technical offense of embezzlement; and while abstraction includes misapplication the latter offense is more comprehensive than the former, since in abstraction a taking or withdrawing must be shown: U. S. v. Breese, 131 Fed. 915, (Dist. Ct. N. C.) ; U. S. v. Harper, 33 Fed. 471, (C. C., Ohio) ; and U. S. v. Youtsey, 91 Fed. 864, (C. C., Ky.)

In U. S. v. Britton, 107 U. S. 655, (1882)—a case more fully hereinafter referred to—it was said at page 669, "The words 'willfully misapplied' are, so far as we know, new in statutes creating offenses, and they are not used in describing any offense at common law. They have no settled technical meaning like the word 'embezzle,' as used in the statutes, or the words 'steal, take and carry away,' as used at common law. They do not, therefore, of themselves fully and clearly set forth every element of the offense charged."

By reason of the identity of phraseology in section 5209 of the Revised Statutes, supra, as compared with our act of 1929, and of section 5201, as compared with our act of 1901, federal decisions are a definite aid in disposing of the questions involved upon these appeals.

In U. S. v. Britton, supra, the court was considering the sufficiency of the various counts in an indictment charging the defendant, as president of a national banking association, inter alia, with the misapplication of the funds of the bank through purchasing, for $2,400, forty shares of its capital stock, which, it was averred, were held by him in trust for the use of the bank and were not purchased in order to prevent loss upon any

debt theretofore contracted with the bank in good faith. By section 5201 of the Revised Statutes, just as in the second section of our act of 1901 (note 1 above) the purchase by a bank of its own stock, unless necessary to prevent loss on a debt previously contracted, etc., is prohibited.

In the indictment in the Britton case it was specifically averred that through the purchase of the stock of the bank the defendant willfully misapplied its funds. In the course of its opinion, the court stated that "the purchase of its own stock by the association, except to secure a debt due it, is forbidden by law," but such an act, or the making of loans to any person in excess of the amount limited by the statute, or a violation of section 5201 by making loans on the security of its own capital stock, or the purchase of real estate for an unauthorized purpose, are "acts of maladministration of the affairs of the association by its officers," but do not amount to a willful misapplication of the bank's funds, unless shown to have been for the "use, benefit, or gain of the party charged, or of some company or person other than the association." See also U. S. v. Breese et al., (No. 2) 173 Fed. 402, 411, and U. S. v. Youtsey, supra.

Our act of 1929 expressly makes an intent to injure or defraud the bank an essential ingredient of the crime described therein as a willful misapplication. The indictments we are now considering do not contain averments with respect to the alleged intent of appellants, but as the assignments based upon the overruling of appellants' demurrers to the indictments have been withdrawn, we pass any question as to their sufficiency.

For the reasons indicated, we are of opinion that the trial judge erred in the instructions given by him with respect to the charge of willful misapplication and erred in refusing to affirm the points above quoted. We accordingly sustain the 57th, 62d, 71st and 73d assignments.

It does not follow, however, that appellants are entitled to be discharged under the indictments above specified as relating to the sales of syndicate stock. In our opinion, there was evidence which would justify a court in submitting to a jury, *with proper instructions,* the question whether the acts of appellants in connection with these transactions were, at most, technical breaches of their official duties and responsibilities, subjecting them to discipline by the state banking authorities, or were done, not with a sincere purpose to benefit the institution and its depositors, but in order to protect and advance their personal and individual interests, regardless of the effect upon the bank.

Guided by adequate instructions with respect to the essential elements of the crime of misapplication, it would necessarily be the province of a jury to say what inferences should be drawn from all the facts shown by the evidence and tending to throw light upon the motives of the accused.

2. *Convictions of Harris and Dauphinee of Embezzlement, Willful Misapplication and Fraudulent Conversion through Sales of Their Own Stock.*

The indictments included under this classification were at Nos. 833, 834, 835, 836, 949 and 953, December Sessions, 1933. The first four were based upon sales by Harris and Dauphinee to Greenhouse, and the last two upon sales by Dauphinee to the Hoffman-Henon Company.

Major differences between these sales and those we have already discussed are that the shares here involved were not syndicate stock; they were owned individually by Harris and Dauphinee, and, although the funds with which to pay Harris and Dauphinee were borrowed by the purchasers from the bank, largely upon the security of the shares themselves, the moneys so received by Harris and Dauphinee were not applied either to the repayment of these loans or to the indebtedness

due the bank from the syndicate. Another distinction is that Conro was not involved in any of these transactions.

It is unnecessary, for present purposes, to review in detail the evidence adduced in support of these indictments. Early in December of 1930 Martin Greenhouse, a man of substantial means and the owner of stock in the trust company, was desirous of buying 1200 additional shares at $45 per share, which was about $10 less than its then current market price. Harris was the owner of some 15,000 shares at that time and arranged to sell Greenhouse 1,000 of them. Dauphinee sold Greenhouse 200 shares out of his individual holdings; the certificates were held by the bank as collateral upon the loans to the purchasers. These transactions were the basis of the indictments at Nos. 833-836, under which Harris and Dauphinee were convicted, as principals and as aiding and abetting each other, not only of misapplication but also of embezzlement, abstraction and conversion of these respective items of $45,000 and $9,000. Harris received for his stock a treasurer's check from the bank for $45,000, with which he purchased treasury certificates. Shortly thereafter a run occurred upon the trust company and Harris sold the certificates and applied the proceeds to the reduction of his individual indebtedness to the bank, which at that time was in the neighborhood of $100,000. Greenhouse subsequently transferred his account to his son, Leon H. Greenhouse. The $9,000 received by Dauphinee for his 200 shares seems to have been applied by him toward the payment of his indebtedness to an outside creditor, the Chatham-Phoenix Bank of New York.

In substance, the Hoffman-Henon transaction was that Dauphinee sold 1,000 shares of his trust company stock to the Hoffman-Henon Company for $56,500, the amount paid to him for the same having been borrowed

by the purchaser from the bank upon the security of the stock. Dauphinee applied the money he received to the reduction of his indebtedness to third parties— $50,264 to the Hano-Wasserman Company, stock brokers, and $6,235 to the Bankers Trust Company. These transactions formed the basis for the indictments at Nos. 949 and 953. In them there was obviously involved the question whether these two appellants had applied the funds thus secured from the bank to their own use and for their own benefit.

The difficulty arises out of the manner in which the evidence was submitted. Immediately after reviewing these two transactions, the trial judge said: "If you find from the evidence, in each of these transactions that the loans to the purchasers of the stock were made in part or in whole on the security of the bank's stock, then there is a misapplication of the bank's funds."

Before the jury retired counsel for appellants took a specific exception to this instruction.[2]

This procedure raised the question fully and squarely, but the trial judge declined to modify the instruction and merely directed that the exception be noted. The above quotation from the charge is embraced in the 62d assignment.

It is due the trial judge to note in this connection that in the introductory part of his charge, and referring to the element of intent under the act of 1929, he properly said: "The intent to do a certain thing, being an emotion of the mind, seldom, if ever, is ca-

[2]"We ask for an exception to that part of the charge in which referring to Harris and Dauphinee in the bills with respect to the Hoffman-Henon and the Greenhouse transactions, the court said that if the jury find that the loans were made in part or in whole on the security of the stock of the Franklin Trust Company that then that is a misapplication because that, in itself, cannot constitute a misapplication under any circumstances, and because the court failed to tell the jury that it had to be done with intent to injure and defraud the bank."

pable of direct or positive proof, but is arrived at by such just and reasonable deduction from the act and facts proven as the guarded judgment of a reasonable, prudent, cautious man would ordinarily draw therefrom."

It is also true that after reviewing at length the testimony upon both sides relative to the sales of syndicate stock and the sales by Harris and Dauphinee of their own stock the trial judge said: "Except insofar as these defendants knowingly and with intent to injure or defraud the bank, if you find that from the evidence, loaned money of the bank on their own syndicate stock as security therefor, the operations of the syndicate as a syndicate, and the borrowing of money from the bank, do not constitute a crime. Let me clarify that statement. If the syndicate was organized for a lawful purpose, then the lending of moneys to the syndicate by the bank, even though unsecured, is not a crime, and of itself does not militate against any of these defendants. Another situation is presented, however, when these defendants as officers of the bank and as members of the syndicate knowingly loaned the funds of the bank to depositors taking as security the syndicate stock. The syndicate is not on trial; you are trying the question of whether or not these three defendants or any of them fraudulently, knowingly, willfully misapplied, embezzled, abstracted or converted any of the bank's funds to their own use, and in the embezzling, abstracting and willful misapplication acted with intent to injure or defraud the bank."

These instructions were given near the conclusion of the charge and with relation to the offenses of embezzlement, abstraction and fraudulent conversion, as well as the charge of misapplication. We are not satisfied that they neutralized the prior erroneous and specific instructions to the effect that if the jury found these bank officers made loans on the security of the stock of the

bank, such a finding, without more, would support a conviction at least of misapplication. In other words, while the trial judge did instruct the jury that the organization of the syndicate and the borrowing of money from the bank by the syndicate did not constitute a crime, he declined to charge, as requested, that the mere loaning of the bank's money upon the security of its own stock was not, of itself, a crime.

For the reasons stated at length in the preceding division of this opinion we sustain the 62d assignment.

3. *Convictions of Dauphinee and Conro of having made False Entries and of Conro for a False Report.*

The first indictment in this classification, No. 1010 September Sessions, 1933, charged Dauphinee and Conro, in brief, with causing and procuring the making of false entries in that portion of the books of the bank in which was recorded the account of the A. H. Geuting Company, which entries purported to show that this depositor had made a deposit of $20,000 on September 25, 1931, and had withdrawn the same amount on September 26th.

There was testimony by one Fernan, assistant secretary and treasurer of the bank and charged with the duty of seeing that the reserves required by law were maintained, that the cash reserve was low on September 25th by the amount of $20,000, and that at the direction of Dauphinee, and with the concurrence of Conro, he made the "wash entries" in question for the purpose of concealing the shortage in the cash reserve. Fernan's testimony was contradicted positively by Dauphinee and Conro. There was, therefore, a clear issue of fact under this indictment which was fairly and adequately submitted to the jury.

The other indictment, No. 1213 July Sessions, 1934, charged in substance, that Conro, in making a report to the Secretary of Banking of the condition of the

trust company at the close of business on the twenty-fourth of September, 1930, falsely reported the contingent liabilities of the various directors of the bank, as guarantors or endorsers, by failing to include therein the $45,000 guarantees given by each, as hereinabove stated, to secure the repayment of the moneys borrowed by the syndicate, and by failing to report his own guarantee in the sum of $15,000.

Here, again, questions of fact were involved which could be determined only by a jury. If these two cases were not affected by other assignments, founded upon alleged errors involving the entire trial and about to be considered, we would not interfere with the judgments at the above numbers.

### 4. Consolidation of Indictments.

By the 2d, 4th, 5th, and 6th assignments it is charged that the court below erred in consolidating for trial, over the vigorous objection of counsel for appellants, the twenty-seven indictments returned by the grand jury, and in refusing to direct the district attorney to elect upon which indictment, or group of indictments, he would first go to trial. The second assignment relates specifically to the false report bill at No. 1213 July Sessions, 1934, and the fourth to the false entries bill at No. 1010 September Sessions, 1933.

We think these assignments, affecting the entire trial, are well grounded and must be sustained. The complaint, as we understand it, is not against the refusal of separate trials to defendants jointly charged in a single indictment. Granting or refusing such severances (except in cases of felonious homicide) is entirely within the discretion of the court under the provisions of the Act of March 31, 1860, P. L. 427, Sec. 40, 19 PS § 785.

The real question here involved is whether the consolidation of all these indictments for trial at the same time and before the same jury was so prejudicial to

the rights of appellants as to amount to an abuse of the discretion vested in a trial judge.

We have had occasion to examine this subject in two recent cases—Com. v. Schmidheiser et al., 111 Pa. Superior Ct. 283, 169 A. 572, and Com. v. McCord et al., 116 Pa. Superior Ct. 480, 176 A. 834, in which an allocatur was refused by the Supreme Court.

In the first of these cases we held there had been an abuse of discretion but not in the second. The applicable authorities were collected and examined in these decisions and the result thus stated by PARKER, J., at page 486 of the McCord case: "The true rule would now appear to be that just as in cases where a defendant is charged in one indictment by separate counts with different offenses, or where one defendant is charged in separate indictments with different offenses, so likewise where two defendants are indicted for the same misdemeanor growing out of the same matters and circumstances so related that the proofs received in one would be competent in the other, even though the defendants demand separate trials, whether either will be prejudiced by a joint trial and they are therefore entitled to a severance is a matter for the trial court to determine in the exercise of a sound discretion, and the appellate courts will not reverse except for a clear abuse of such discretion." We therefore now inquire whither the guide posts, thus set up, lead us in the present case. It is clear from what has already been said that the only transactions in which all three appellants were jointly concerned were those connected with the organization of the syndicate and the sales and purchases of syndicate stock. The fifteen indictments considered in the first division of this opinion were all based upon loans for the purchase of syndicate stock and form a distinct and separate group of related charges. Under the above rule of law, it would not, in

our opinion, be an abuse of discretion to consolidate this group of indictments into a simultaneous trial.

The next group of six indictments, analyzed under the second division of this opinion, related only to sales of stock made by Harris and Dauphinee. The shares sold were not syndicate stock but belonged to them individually, and the applications made by them of the proceeds of these sales differed materially from the application of the proceeds of the sales of syndicate stock. Conro was not a party to these sales by Harris and Dauphinee, nor was he in any way responsible for the manner in which they used the money thus acquired. Conro never sold any of his own stock. It is difficult to escape the conclusion that he may have been prejudiced by the testimony relative to Dauphinee's extensive transactions with stock brokers. We think Conro should not have been subjected to the serious implications arising out of the Greenhouse and Hoffman-Henon transactions.

The impropriety of consolidating the indictments charging the making of false entries and a false report (section three hereof) is even more apparent.

Harris had nothing to do with these offenses; nor were they connected in any way with the embezzlements and misapplications with which he was charged.

The false entry charges were so separate and distinct from the charges arising out of the sales of stock that the proofs received in support of each class had no bearing upon the other.

This was so clear that the trial judge did all he could do at that stage of the trial by charging: "The jury in reaching a verdict on these two bills must not only consider them separately from all the other bills, but must also avoid being affected or influenced in any way at all respecting the guilt or innocence of the defendants named therein by any evidence that was offered in connection with the other bills in the case. If

you were to permit such other evidence to enter into your deliberations you would not be dealing fairly either with the defendants or with the commonwealth."

With twenty-three indictments, (containing at least sixty-eight counts and charging appellants both singly and jointly and as principals and aiders and abettors) and with testimony (covering eight hundred printed pages) all submitted to them in a charge of forty pages, it is impossible to have any assurance that this instruction was obeyed by the jurors.

In our opinion, these considerations lead to the conclusion that the indictments should have been classified into at least three groups for trial, and that forcing appellants to go to trial at the same time upon all of them was not a proper exercise of discretion.

5. *Additional Assignments.*

The printed assignments of error are eighty-five in number. In view of the conclusions above stated, no purpose would be served in classifying and discussing those we have not referred to specifically. A number of them grow out of the admission, as against all the appellants, of the evidence relative to Dauphinee's transactions with stock brokers and outside banks.

When these cases are retried, in such groups as we have herein indicated would be unobjectionable, some of the matters out of which many of the present assignments have arisen will be obviated.

By the 52d assignment, however, it is charged that the trial judge erred in his instructions to the jury with respect to what amounts to a "reasonable doubt."

The main criticisms made by counsel for appellants are that the trial judge said a doubt in order to be reasonable must be "well *founded on reason* and common sense," and such a doubt as "would cause a reasonable man, in the conduct of his *usual* and *ordinary* affairs, to stop, hesitate and seriously consider as to whether he should do a certain thing." They contend

the jury was told, in effect, that the only kind of a doubt which would justify an acquittal was such a doubt as a juror could give a reason for entertaining by pointing to "matter in or from the evidence on which to base the doubt." It is argued that to require that the doubt be "well founded on reason" would be to require that it be a "demonstrable doubt, logically and conclusively sustained by the evidence or want of it."

Under the disposition we are about to make of these cases, it is sufficient to say that this branch of the charge could be improved by adopting the phraseology approved by our appellate courts in defining the doctrine of reasonable doubt. In order to be "reasonable," the doubt must be substantial as opposed to fanciful, but it is not essential that a juror be able to give "some proper reason for entertaining it"; it may exist "without his being able to formulate any reason for it": Com. v. Baker, 93 Pa. Superior Ct. 360; Com. v. Green, 292 Pa. 579, 141 A. 624.

The illustration uniformly used in the authorities is not that of a person hesitating to act while conducting his "usual and ordinary affairs," but when engaged in matters of "importance" or "highest concern" to himself: Com. v. Drum, 58 Pa. 9; Com. v. Andrews, 234 Pa. 597, 83 A. 412.

Another complaint under this assignment is that the trial judge declined the motion of appellants' counsel, at the conclusion of the charge, that the jury be instructed to give the accused the benefit of any reasonable doubt they might entertain. We think the request should have been granted.

Other interesting questions relative to the polling of the jury and the impersonation of a juror (regularly drawn and summoned) by his brother are raised by a number of assignments.

Having concluded, upon the grounds herein stated,

that the interests of justice require a retrial of these cases, we need not prolong this opinion. by considering and disposing of any additional grounds for a new trial.

The judgments appealed from are severally reversed with venires.