**WAGNER v. UNITED STATES.**

No. 10916.

United States Court of Appeals
Fifth Circuit.

Dec. 14, 1948.

Rehearing Denied Jan. 22, 1949.

Crampton Harris, of Birmingham, Ala., for appellant.

John D. Hill, U. S. Atty. and Robert Giles, Asst. U. S. Atty., both of Birmingham, Ala., for appellee.

Before McCORD and LEE, Circuit Judges, and MIZE, District Judge.

MIZE, District Judge.

Appellant was indicted on September 9, 1943 in the Southern Division of the Northern District of Alabama for violation of the Mann Act.[1] The indictment contained six counts.

The material parts to the decision in this appeal of the first count charge: "On or about the 31st of January, A. D. 1943, at or near Birmingham in the County of Jefferson, State of Alabama, within the jurisdiction of this court, Ivan Laughlin Wagner, alias Jack Wagner, alias Marion Shelton * * * did then and there unlawfully and knowingly transport and cause to be transported and aid and assist in obtaining transportation for and in transporting in interstate commerce, that is to say, from Birmingham in the State of Alabama to Richmond in the State of Virginia, a certain woman or girl, to-wit, Elsie Mae Underwood, alias Evelyn Ellis, whose name is otherwise unknown to the jurors, for the purpose of prostitution and debauchery and for other immoral purposes, and with the intent and purpose on his part to induce and entice such woman or girl to engage in certain immoral practices, etc." Counts 2, 3, 4, 5 and 6 are substantially in the same language, except as to dates and as to the names of the women.

At the trial on the indictment, count two was dismissed by the government and the defendant was convicted on each of the other counts. On the first count he was sentenced to a term of five years and on the sixth count he was sentenced to a term of five years to begin at the end of the term imposed on count one. On counts three, four and five he was placed on probation for five years, to begin at the expiration of the sentence imposed on count six. He was arraigned under the indictment on October 4, 1943 at Jasper, Alabama, which was in the Jasper Division of the Northern District of Alabama, and entered his plea of "not guilty". The judgment of arraignment recites as follows: "This day comes the above named defendant, Ivan Laughlin Wagner, alias Jack Wagner, alias Marion Shelton, and waives his right to appear before the court at Birmingham * * * and asks leave of the court to appear before the court at Jasper in the Jasper Division of the Northern District of Alabama and enter his plea." At the time of his arraignment at Jasper his attorney was not present and one of the assignments of error before the court now is based upon the absence of his attorney at the arraignment

[1] In 1948 Criminal Code, 18 U.S.C.A. §§ 2421–2424.

and the assertion on the part of the appellant that he did not waive the presence of his attorney. Thereafter the case was set for trial on December 13, 1943 before Judge Murphree, now deceased, at Birmingham, and at the trial he was ably represented by counsel of his own choice, and, as above stated, was convicted on the 14th day of December, and sentence was imposed. On the 15th of December, 1943 he filed his notice of appeal and was permitted by order of February 2, 1944 to appeal in forma pauperis, and he was granted until March 1, 1944 to prepare and file his bill of exceptions and perfect his appeal. His appeal was not perfected at that time and this court dismissed that appeal for failure to perfect and prosecute same. After his incarceration he filed a petition which the trial court treated as an application for a writ of error coram nobis and the prayer of his petition was denied. This court, in a per curiam opinion, affirmed the judgment. 157 F.2d 516. Certiorari was denied by the Supreme Court of the United States. 330 U. S. 846, 67 S.Ct. 1080, 91 L.Ed. 1290. He filed a petition for writ of habeas corpus in the district court of Kansas and after a hearing it was denied, and the action of the trial court was affirmed by the Court of Appeals. Wagner v. Hunter, 10 Cir., 161 F.2d 601. Certiorari denied. Wagner v. Hunter, 332 U.S. 776, 68 S.Ct. 39. Thereafter he filed a motion in this court for reinstatement of the appeal without limitation as to the time and this court denied the petition. The Supreme Court granted certiorari and ordered that the appeal be reinstated. Wagner v. United States, 333 U. S. 870, 68 S.Ct. 895. The matter is now here on the record of the proceedings upon the original trial thereof as well as the matter that arose upon his being brought back to perfect the record for his appeal. Upon his being returned to the district court for the purpose of perfecting his record upon the reinstated appeal, he filed on May 24, 1948 a motion to correct the recitals in the record of his arraignment at Jasper, Alabama had on the 4th of October, 1943 so as to recite that he did not intelligently waive the presence of his counsel. The trial court had a full hearing upon this motion, at which the appellant himself testified, as well

as did other witnesses, and the trial court adjudged that he had intelligently waived the presence of his counsel and consented to be arraigned at Jasper, Alabama. At this hearing upon this motion he was ably represented by counsel appointed by the court and who has ably represented appellant in the preparation of the present record and upon the hearing of the appeal before this court.

Most of the questions involved in this appeal are raised by virtue of paragraph (b) of Rule 52 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., which reads: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The first four specifications of error raise the point that there was not sufficient evidence to support a conviction on counts 3, 4, 5 and 6 of the indictment. Specifications of error numbers, 5, 6, 7, 8, 9 and 10 raise points that the court below improperly instructed the jury as if the appellant were indicted under Section 399, Title 18, U.S.C.A. [now 18 U.S.C.A. § 2422], when, as a matter of fact, he was indicted under Section 398 of that Title [now 18 U.S.C.A. § 2421], and each one of the assignments last named objects in substance to that part of the charge wherein the court said: "It is not an essential thing in a case of this type that a woman know the purpose of the defendant or the person who transported her or caused her to be transported or induced her or enticed her to be transported for that purpose." Each one of these assignments objects to the language using the words "induces", "persuades" or "entices", and urges that such language was prejudicial and was error. No exceptions were taken by counsel for the appellant to the charge at the time, but as above stated, these assignments are raised by the appellant and noticed by this court pursuant to Rule 52. It is necessary to set out at length practically the entire charge of the court in order to determine if these assignments contain sufficient merit to require a reversal. The court charged as follows:

"The court cannot decide the facts in this case, but can only give you the law as it pertains to the case, and when you have received the law in the case, you having

heard the testimony, then you will retire to the jury room and consider the evidence that you have heard, together with the law the court gives you in its charge.

"Gentlemen, this indictment did originally consist of six counts. Each count of this indictment states a case against this defendant—I mean it states a charge against him. The second count has been withdrawn by the Government's attorney, leaving for your consideration Counts 1, 3, 4, 5 and 6.

"This indictment—these counts charge this defendant, Ivan Laughlin Wagner, alias Jack Wagner, alias Marion Shelton, with having violated what is known commonly as the White Slavery Traffic Act, and is known as the Mann Act, in honor of the man who introduced the Bill in Congress to make it unlawful to transport women or girls in Interstate Commerce for the purpose of debauchery, drinking or for other immoral purposes such as sexual intercourse.

"Gentlemen, Congress passed this law for the protection of the women and girls of this country, to protect them from prostitution and debauchery and other immoral purposes.

"The thing that gives this court jurisdiction of this case is the fact that the victims, we call them, the women must be transported from one state to another in Interstate Commerce.

"Now, that Act provides, gentlemen, that whoever transports or causes to be transported or induces or entices or persuades or forces any woman or girl to commit or to indulge in acts of debauchery and prostitution, immoral purposes, is a law violator.

"Now, the law provides, gentlemen, this: any man, or other person, for that matter, doesn't necessarily mean a man; we have women who are guilty of engaging in organized vice among women, as well as men, and this law says and means that when any person transports or causes to be transported any woman or girl for the purpose of debauchery and prostitution or other immoral purposes, such as sexual intercourse, must be at the time of that transportation or at the time he caused the transportation or at the time he induced or persuaded or enticed the man—I mean woman or girl or women or girls—to go from one state to another state for that purpose, his intent must be for that purpose, and intent must have existed in the defendant's mind at or before the time the woman or girl crossed the state line, from New Orleans to Birmingham in this case. The defendant must have had in his mind at the time the victim or the girl left the state of Louisiana to enter Alabama, that must have been his purpose, his intent, that is, for her to indulge in acts of debauchery and prostitution and illegal or immoral purposes. It doesn't matter whether he consummated his purpose or not. The main thing in the case, you must be satisfied from this evidence to that degree of proof to which I will refer in a moment that at the time he transported or caused her to be transported or induced her to be transported it was his purpose and intention for her to engage in acts of debauchery and prostitution or engage in immoral practices—conduct, I mean, at the time she leaves the state of her residence or where she is and goes across the line to another state. Whatever his purpose may have been, it is on the Government to show, it is necessary, gentlemen, for that purpose to exist at the time or before the girl or victim leaves one state to enter into another one. And it is not an essential requirement in cases of these kinds—of this kind that the defendant or the man actually consummate that unlawful purpose; she may not commit the acts, she may not practice debauchery on that trip, but if he had the purpose at the time she left one state to enter into another, of course, he would be guilty, whether he committed the acts or not. If she consummated the act, gentlemen, that is a question for the states to pass upon, where the acts are committed, if the state finds that the victims violated the law, why, they can prosecute them in the state court.

"It is not an essential thing in a case of this kind that the woman know the purpose of the defendant or the person who transported her or caused her to be transported or induced or enticed her to be transported for the purpose. It is not necessary that the woman be apprised of his intention or purpose.

"Gentlemen, it doesn't make any difference what kind of a woman it is. The law doesn't say it is necessary that she be a chaste woman. It is any kind of a woman or girl, whether she be a prostitute or chaste. Anyone who intentionally or for the purpose of debauchery or prostitution or immoral conduct induces, persuades or entices a woman or girl to go from one state to another, why, he would be guilty if he did that.

"Now, I will say that it must be his purpose. How do you determine a man's purpose? That is what is in his mind. That is something you cannot put your hand on like you put it on a book or some object. You can't see a man's thoughts, you can't hear them, so how are you going to determine what a man's thoughts were on a particular occasion? Gentlemen, that is to be determined by you in this case, by you jurors, from the facts and circumstances surrounding the parties at the time, the relations of the parties, where they go, the environment they go to, what they do, their acts or what their acts may be, these are the circumstances from which you are to draw your conclusions or inferences as to what the defendant's state of mind was as to the purpose at the time the girl in question was transported from one state to another. If a woman goes from one state to another and not according to a pre-arrangement with some man, has sexual intercourse with him, that man would not be guilty under this law. If he didn't decide to cause that woman to make this trip with that purpose in mind, if there was no other purpose in connection with the woman and they had illicit relations, that would be a mere incident to his trip, and, of course, he wouldn't be guilty under that kind of circumstances.

"Gentlemen of the Jury, the burden of proof in this case is upon the Government to satisfy you beyond a reasonable doubt that the defendant is guilty as charged in each count,—Counts 1, 3, 4, 5 and 6.

"Gentlemen, the defendant is presumed to be innocent of each one of those charges, and that presumption follows him—as a matter of fact, all men in the eyes of the law, all defendants in all counts of that indictment are presumed to be innocent, and in Alabama you are presumed to be innocent. and this defendant is in this case. That presumption follows him with you in that jury room and until you deliberate and consider all the evidence in this case, and it follows him then until you are convinced beyond a reasonable doubt that he is guilty as charged in each count, in those counts.

"I don't think it is necessary to go any further in the law of this case. I could discuss this evidence with you. I don't care to do so. I have the right to do it. Of course, if I discussed the evidence I would express to you my views on the believability of the evidence. That is for you. You are the final arbiters of the facts in this case, gentlemen; you are to determine whether this defendant is guilty or not guilty under each one of these respective counts, and you are to reconcile this testimony in trying to reach that question in arriving at whether he is guilty or not guilty. That is your question; that is your province to say whether he is guilty or not guilty. Now, in determining that question you want to weigh the testimony you have heard, and you are not to consider any evidence that hasn't been introduced here. No other evidence is to be considered in this case, other than the reasonable inferences that may be drawn from the facts that you have heard and seen in this case.

"Now, you are to draw your conclusions and your inferences; that is within your province and your duty as jurors. Now, in doing that, gentlemen, you have got to—you have got to take into consideration—should take into consideration the demeanor of any witness who has taken the stand, any interest that may be shown by any witness, if any, and whether any witness has been biased or prejudiced against the defendant. All of that is to be considered by you in connection with what degree of credibility you will give each witness, what degree of believability you will accord each witness. You sift this evidence down, determine which witness has forgotten or which ones have been mistaken or which one has spoken any untruthful statement on the stand. All of those things are to be considered by you.

"Now, gentlemen, you are prominent members of the citizenship of the Northern District of Alabama. You know the ways

of life of our people. You have had your experiences. You are men of good judgment and common sense or you wouldn't have been on this jury.

"Now, in weighing this testimony and considering this testimony, I ask you in weighing this testimony and in any inferences that may be drawn from it you apply your everyday knowledge and common practical sense to the facts in this case in connection with the law, and it seems to the Court you should not have any trouble in arriving at a verdict in this case.

"Gentlemen of the Jury, after considering all the evidence in this case—before that, I want to say one thing to you and then I will close. This indictment, in stating the time of the alleged violations of the defendant in this case, has used the words, 'on, to-wit', 'on or about'. 'On, to-wit' means on or about, within a reasonable time before or afterward the time set forth in the indictment, in the count. The time might vary a month or two months or three months, any reasonable time within the period set forth in the indictment. When it says 'on to-wit' it means on or about.

"If you find the defendant not guilty as charged in the indictment, that is, if you acquit him under each one of these counts of this indictment as charged, that is, if you acquit him, then the form of your verdict will be, 'We, the Jury, find the defendant, Ivan Laughlin Wagner not guilty as charged in the indictment'. That is, if you acquit him on each count. But, on the other hand, after a consideration of all of the evidence in this case you find this defendant guilty as charged in one or more counts or all of them, except Count 2, which is not submitted to you for your consideration, then the form of your verdict will be, 'We, the jury, find the defendant, Ivan Laughlin Wagner, guilty as charged in Count #1', or more than one count, or whatever they might be—giving the number of the count or counts and fill it in, 'as charged in the indictment.' In other words, if you find him guilty under Count 1, the form of your verdict will be, 'We, the Jury, find the defendant, Ivan Laughlin Wagner, guilty as charged in Count 1 of the indictment', or if you find him guilty under all

the counts with the exception of Count 2, you would fill them in, whatever your verdict might be."

After having delivered his oral charge, the Court stated he would give the requested written charges and read them to the jury as follows:

"1. I charge you, gentlemen of the jury, an immoral purpose, motive or intent at the time of the transportation is an essential element of the crime. It is the immoral purpose which renders the inter-state transportation of the woman or girl criminal. Such intent or purpose must have been in the minds of the defendants at or before the time of the inter-state travel.

"2. I charge you, Gentlemen of the Jury, that an immoral purpose, motive, or intent at the time of the transportation is an indispensable ingredient of the crime, and must be proved beyond a reasonable doubt by the Government before the jury is authorized to convict the defendant.

"3. I charge you, Gentlemen of the Jury, that the language of the statute is directed against the transportation of any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, with the intent or purpose of inducing or enticing or compelling any woman or girl to become a prostitute or to engage in any other immoral practice. The jury must believe beyond a reasonable doubt in this case that the purpose of defendant at the time of the transportation was to expose the woman or girl to influences or conditions that would necessarily or naturally lead to a life of debauchery or prostitution, and unless the jury are so convinced beyond a reasonable doubt, they must acquit the defendant."

At the conclusion of his charge and before it was submitted to the jury, the court asked if there were any exceptions, and none were noted.

Specification No. 11 raises the point that the court committed error in admitting a letter written on stationery of the Redmont Hotel at Birmingham to Joyce Kilmer at Richmond, Virginia, she being the same person as Betty Morgan. It was postmarked at Birmingham, Alabama, Jany. 29, 1943, and, among other things, speaks of the "hot

360

situation" prevailing in Birmingham due to raids and complains about the dumbness of the new girl, and that the writer is checked in the hotel as "Marion Shelton". The letter is signed "Jack". The letter had various postmarks on it, showing it had been forwarded from Richmond to Monroe, to New Orleans, to Birmingham, and according to the last stamp date on it, that was March 10, 1943. The letter came into the hands of E. L. Jackson, FBI agent, on September 13, 1943. The FBI agent testified that he obtained this letter at the Walker County jail from the jailer and sent it to the FBI laboratory in Washington. This letter was shown by the handwriting expert to have been written by the appellant. The record does not show how the letter came into the possession of the jailer, but shows, without conflict, that it was not unlawfully taken from the appellant by any officer of the government, and very clearly that it was not abstracted from the mails.

Assignments of error 12 and 13 raise the points that the trial court, in the proceedings had upon the return of the appellant, erred in overruling his motion to correct the record as to the arraignment of the defendant, and in overruling his motion for a recital that his attorney was absent from the court room when the jury returned its verdict.

Assignments 1, 2, 3 and 4 may be considered as a group since they challenge the sufficiency of the evidence to support a conviction under Counts 3, 4, 5 and 6 of the indictment. Each one of these counts charges the unlawful transportation or causing to be transported, Betty Morgan, in inter-state commerce for debauchery. It is the contention of the appellant that, at most, the evidence shows that she was simply induced by the appellant to go from one state to the other. With this contention we cannot agree. The record indicates clearly that the appellant was the moving cause of that transportation. The appellant devised a scheme by which he would cause not only Betty Morgan, but various other girls, to go from state to state on various occasions and particularly Betty Morgan on the dates charged in the indictment, and to the respective places, for the purpose of engaging in debauchery and hustling for business.

He operated on a large scale and would pick out places most profitable and keep them advised of any prospective raids by the officers, and the jury were fully warranted in drawing the conclusion that he was the moving cause in each trip of Betty Morgan, as alleged in each one of these counts. The jury was not required to rely upon the testimony of Betty Morgan alone, but they were justified in considering all of the facts and the conduct of the appellant in connection with other girls under his control and supervision.

June Maxine Parks Blankenship is not mentioned in the indictment, but testified in the case of her connection with the appellant and described his plan and scheme for engaging in the unlawful enterprise devised by him, and from her testimony an inference can be drawn connecting him with the transportation of Betty Morgan. The record indicates without conflict that the Redmont Hotel in Birmingham was the main headquarters from which appellant conducted his unlawful operations. She testified that she first met the appellant in Birmingham about August, 1942, and went with him and another girl known to her only as Tommie to the Redmont Hotel, and when she wanted anything, the appellant would buy it for her; that the appellant sent her to Chicago accompanied by a girl named Hattie, and from there she went to Indianapolis, where the appellant met her, and that on these trips she got money from him; her reservation had been made for her in Chicago and the appellant had instructed her to see the bellboy there; that she saw the appellant and he instructed her to spend the night in Carlos Cabarello's room. The record shows, but not by this witness, that Cabarello was one for whom Betty Morgan hustled in this debauchery, and on this occasion she said that she and Jack and Cabarello had a conversation there in Chicago, making plans as to their method of work while at Vernon, and that she worked in Chicago for the appellant for about five and a half weeks, along with three other girls; that she later, about January, 1943, saw the appellant at the Redmont Hotel and he wanted to know why she ran off from him in Chicago; that when she went to the Redmont Hotel on the second

trip Elsie Mae Underwood went with her and that while there, but in the absence of Elsie Mae, she and the appellant talked about whether she was going to join him in the racket again or not.

Elsie Mae Underwood, who is one mentioned in the indictment in the first count of the indictment, testified that she knew the appellant as Marion Shelton, and that she first met him the early part of January, 1943 at the Redmont Hotel in Birmingham; that June Blankenship took her up to his room and they had some drinks, and she spent the night at the hotel with the appellant and he told her he wanted her to go to work for him; that he would send her to Richmond, Virginia, and, as a matter of fact that he did so, giving her the money with which to pay her fare and that he went to the terminal station with her; that he made the arrangements for her in Richmond, and called two girls there and told them to meet her. She did not know these girls at that time, but he told her one would be wearing silver fox furs and green tinted glasses and the other one would be with her. When she arrived there two girls, Elizabeth Culver and a girl named Betty, met her as planned, dressed in the way he told her they would be; that Mrs. R. L. Jamison, also known as Joyce Kilmer, and also as Betty Morgan, was one of those who met her, as she afterward found out. From Richmond they went to Charlotte, and then to Monroe, Louisiana; that Betty Morgan and Betty Briggs accompanied her to Monroe; that she engaged in debauchery and turned some of the money over to the appellant, as did also Betty Briggs; that later appellant returned some of that money to them: "Q. What was the arrangement between you and Jack and the girls as to how much money he would give you all? A. He gave us about $10.00 every week." When the appellant was around he paid for her meals; that when she left Richmond Betty Briggs and Betty Morgan told her that Richmond was "hot"; that when she left for Richmond the appellant had told her to engage in prostitution at that place; that when she was in New Orleans and left for Richmond she did so under the instructions of the appellant, and that Betty Morgan went to Birmingham; that she was present

in Monroe in February, 1943 when the appellant got Betty Morgan to go from Monroe to Birmingham and was present at the time he gave her instructions; he instructed Betty Morgan that she should check in at Birmingham at the Redmont Hotel and there engage in prostitution, and that she was to call the appellant when she arrived there; that the appellant paid Elsie Mae's transportation from New Orleans to Richmond; that when she was in Richmond in early February, 1943, she remained about two or three weeks, registered at the William Byrd Hotel and Betty Briggs was with her and that the appellant came up and checked in at the same hotel; that Betty Morgan goes by the name of Mrs. Culver, Mrs. Jamison and Betty Morgan; that when they left Charlotte to go to Monroe the appellant made the arrangements; that Betty Briggs and Betty Morgan were working for him; that she has seen the girls turn money over to the appellant, and she, likewise, did the same thing; that the appellant would instruct them where to go.

Betty Morgan testified that she first met the appellant in New Orleans, probably in the early fall of 1941 and that sometime about the middle of August, 1942, when they were in New Orleans, the appellant told her Birmingham was a good spot; that at this conversation Alice Swanson was present and she thought Carlos Cabarello was also; that she and Alice Swanson made the trip to Birmingham and at that time Alice was working for the appellant, and she knows that Alice mailed him some money from Birmingham; that on another occasion she made a trip from New Orleans to Birmingham at his suggestion, accompanied by Alice Swanson; in Birmingham they were registered at the Redmont Hotel; likewise, on another occasion in Monroe, Louisiana he told her to go to Birmingham, which she did, and registered at the Redmont Hotel; that in January, 1943 while she was in Richmond the appellant talked to her over the telephone and told her that he had another girl in Birmingham that he was sending up to Richmond and for her to meet the train, and described how she was dressed; that he told her, Betty, to wear green glasses and silver fox furs, so they would know each other; she met this girl,

who later turned out to be Elsie Mae Underwood; that the appellant never went with her from Birmingham to New Orleans, but made arrangements for her to meet him: "Q. Did he ever go with you? A. Well, I never came all the way through with him. Q. Who paid your fare? A. I don't know. Either Carlos or Jack." She stated she came to Birmingham many times: "I saw him (appellant) several times.

"Q. You went when you got ready? A. No.

"Q. What? A. No.

"Q. What kept you from going? You didn't need any gun or anybody to encourage you to go? A. I was encouraged by Carlos Cabarello and Jack Wagner. * * *

"Q. Did anybody tell you that you had to go? A. I don't think the terms were quite that strong.

"Q. Well, how strong? A. I was told that I could.

"Q. Then what did you do? A. I hustled.

"Q. For yourself? A. No.

"Q. For whom? A. For the man I was with at the time.

"Q. Who was the man you were with? A. Carlos Cabarello. * * *

"Q. Who furnished that money to pay for your ticket from New Orleans when you made that trip? A. Either Carlos or Jack. Carlos was forever borrowing from Jack.

"Q. Did you see him let him have the money? A. The money was handed to me. * * *

"Q. Now, then, were you employed by Jack Wagner? A. No, not employed,— used.

"Q. Did you have a contract with him? A. Not written.

"Q. Have any agreement or understanding about how much he would pay you for hustling for him? A. Yes, there was an understanding that—There was this agreement made,—I wouldn't pay Jack any money.

"Q. Well? A. I didn't pay Jack any money because they would benefit in the long run by building up the hustling spots and it was to my benefit to go with him and his girls because they would build up the spots and I could use the spots."

She further testified that she had an understanding with the appellant when she left New Orleans to go to Birmingham about the 15th of August that she would go there for the purpose of hustling; that she was to go up to Birmingham; the idea was to have as many women as possible and as many spots and to build them up; that the trips she made to Birmingham and to Monroe and to Chicago and to New Orleans, she did not make them because she wanted to, but that nobody pulled a gun on her to compel her so to do: "Q. Nobody enticed you, did they? A. I was both enticed and induced. Q. Who enticed you and who induced you? A. Both Carlos Cabarella and Jack Wagner." She further testified as to various trips during this period of time in and around Richmond and the Carolinas; that in February, 1943 she went direct from Monroe to Birmingham alone but that the appellant had suggested that she go: "Q. Wagner wasn't paying you any salary to work for him, was he? A. No, but Wagner offered me a very enticing proposition. Q. What was the proposition? A. That I should work with his women and I would have to pay nothing. I simply fell in with his group of swank hotels. I would pay him nothing and I would be quite a good deal benefitted, both to him and myself."

■ Many other circumstances could be set out, as shown by the record, which would justify the jury in reaching the conclusion it did, but to do so would unduly lengthen this opinion. The letter that heretofore has been referred to was a circumstance for the consideration of the jury. We think the record abundantly shows that the evidence was sufficient to sustain a conviction on Counts 3, 4, 5 and 6.

The statute under which the indictment was drawn is Section 398 of Title 18, U.S. C.A. [now 18 U.S.C.A. § 2421] which reads: "Any person who shall knowingly transport or cause to be transported, or aid or assist in obtaining transportation for, or in transporting, in interstate or foreign commerce * * * any woman or girl

for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice; or who shall knowingly procure or obtain, or cause to be procured or obtained, or aid or assist in procuring or obtaining, any ticket or tickets, or any form of transportation or evidence of the right thereto, to be used by any woman or girl in interstate or foreign commerce * * * in going to any place for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent or purpose on the part of such person to induce, entice, or compel her to give herself up to the practice of prostitution, or to give herself up to debauchery, or any other immoral practice, whereby any such woman or girl shall be transported in interstate or foreign commerce * * * shall be deemed guilty of a felony".

▆▆▆ Under this Act it is not necessary that one actually transport himself or her or that he shall procure the tickets, but it is sufficient if he causes to be transported or aids or assists in obtaining the transportation for the purpose set out in the statute. The jury were fully warranted in finding that the appellant caused the transportation or aided or assisted in procuring the transportation of Betty Morgan as set out in each of the counts. "Cause" is a broad term and one that has a well known meaning, but difficult of a specific definition. In the case of United States v. Kenofskey, 243 U.S. 440, 37 S.Ct. 438, 439, 61 L.Ed. 836, in defining the word as used in the criminal code with reference to anyone devising a scheme to defraud and causing the letter to be placed in the Post Office, the Supreme Court of the United States said " 'Cause' is a word of very broad import and its meaning is generally known. It is used in the section in its well-known sense of bringing about, and in such sense it is applicable to the conduct of Kenofskey. He deliberately calculated the effect of giving the false proofs to his superior officer; and the effect follows, demonstrating the efficacy of his selection of means." In the case of United States v. Reed et al., 2 Cir., 96 F.2d 785, 787,

the court said: "What appellant Reed did, however, was enough to justify the jury in finding that she brought about Sally Kelly's going to New York and what both appellants were shown to have done also justified the jury in finding that they brought about the journey of the other girls from New York to Florida."

The appellant urges that this conduct of the appellants simply amounted to an inducement, and that he did not cause the transportation of Betty Morgan in interstate commerce, but under the definitions above mentioned, we think that it is very clear that he not only induced and enticed, but also caused the transportation. He made it so attractive to her that, as she testified, she would be benefitted thereby and that all of the acts of the appellant were more than a mere inducement,—they were the procuring, efficient, and, in fact, only cause of the unlawful transportation. Wilson v. United States, 232 U.S. 563, 34 S.Ct. 347, 58 L.Ed. 728. See also Webster's Unabridged Dictionary, definition of "cause". These assignments, therefore, are without merit.

▆▆▆ Specifications of error 5, 6, 7, 8, 9 and 10 will be grouped together as they raise substantially the same point, except that specification 5 picks out the single sentence of the oral charge to the effect that the Mann Act makes it "unlawful to transport women or girls in interstate commerce for the purpose of drinking". The remaining five of this group allege error of the court in charging the jury at various places to the effect that whoever transports or causes to be transported or induces or entices or persuades any girl to commit debauchery is a violator. It was error to charge the jury that it is unlawful to transport girls in interstate commerce for the purpose of drinking. Moreover, the use of the words: "Induces or persuades or entices" any girl to commit debauchery, or who entices or persuades any girl to be transported for such purpose, etc., as set out in the charge, was error, but we think, taking the charge as a whole and the record in its entirety, that these errors were harmless. There is a distinction between the crimes charged by Section 398 of Title 18 U.S.C.A. [now 18 U.S.C.A. § 2421] and

that provided by Section 399 [now 18 U.S.C.A. § 2422]. Section 399 makes it an offense for anyone who shall knowingly "persuade, induce, entice, or coerce * * * any woman or girl to go from one place to another in interstate or foreign commerce * * * for the purpose of prostitution or debauchery * * * whether with or without her consent, and who shall thereby knowingly cause or aid * * * in causing such woman or girl to go and to be carried or transported as a passenger * * * upon the line or route of any common carrier". Thus it shall be seen that Section 399 [§ 2422] has as one of its necessary elements that the transportation must be by common carrier, and the words used are "whoever induces, entices or coerces", etc. The two statutes are different and define different crimes. La Page v. United States, 8 Cir., 146 F.2d 536, 156 A.L.R. 965; Roark v. United States, 8 cir., 17 F.2d 570; United States v. Saledonis, 2 Cir., 93 F.2d 302. It is apparent from reading the two statutes that, as held in the Saledonis case, one person may be guilty of both offenses, though they arise out of the same transaction. That is to say, a person, under certain facts, can be guilty under Section 398 [§ 2421], and at the same time, if all the elements were present, could be guilty under Section 399 [§ 2422]. See also Kavalin v. White, 10 Cir., 44 F.2d 49; McGuire v. United States, 8 Cir., 152 F.2d 577; Hill v. United States, 8 Cir., 150 F.2d 760. The jury could not have been misled by the charge of the court when taken as a whole, as it is apparent that the court's reference to drinking was not intended to tell the jury that transportation for drinking would be a violation of the law. His reference to drinking, while inaccurate, yet was a mere reference to the testimony, as the court made it clear that the transportation must have been for the purpose and with the intention that the women should indulge in acts of debauchery and prostitution or other immoral purposes. He specifically instructed the jury that the burden of proof was upon the government to satisfy the jury beyond a reasonable doubt that the defendant is guilty as charged in each count, i. e., Counts 1, 3, 4, 5 and 6. He charged them fully upon the presumption of innocence and finally, fully, as to the form of the verdict upon each count of the indictment. The record shows as a whole that the jury not only were warranted in convicting the defendant on each count, but that there would have been a miscarriage of justice had they reached any other verdict. In the case of Moore v. United States, 5 Cir., 161 F.2d 932, 933 it was said: "When a defendant is convicted, as appellant here was, on a fair charge and on a trial containing no objections or exceptions to its course and conduct, only the strongest kind of showing that justice has miscarried will avail him." In that case it was held that while normally a defendant may not claim a reversal except for error duly saved and assigned, the Court of Appeals, when justice requires, may reverse, notwithstanding no objections were made and no exceptions taken. That is the law, and it is the duty of this court, if apparent error appears, to reverse the case, but unless it is clear that error was committed prejudicial to the defendant, the case should not be reversed. See also Benson v. United States, 5 Cir., 112 F.2d 422; Baker et al. v. United States, 5 Cir., 156 F.2d 386.

Considering the entire record in this case, we are of the opinion that this group of assignments of error is without merit.

■■■■ The court did not commit error in permitting the government to introduce the letter addressed to Mrs. Joyce Kilmer at Richmond, Virginia, which the expert testimony showed was written by the appellant. This letter was material and constituted a part of the circumstances in connection with the conduct of the appellant. It was signed under his alias "Marion Shelton". If this letter was unlawfully taken by the jailer from the appellant, and there is no evidence that it was, the appellant could not complain of such unlawful search by a state officer. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048, 13 A.L.R. 1159; Feldman v. United States, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408, 154 A.L.R. 982. It is clear from the record that no officer of the government intercepted or abstracted it from the mails. It was written on the stationery of the Redmont Hotel, which was Wagner's Birmingham headquarters, and postmarked January 29, 1943, which is during the period covering the con-

duct of the appellant, and the circumstances testified to in the record link it up strongly with the appellant. It was competent for the consideration of the jury, and there was no error in its admission.

■ There was no error committed by the trial court in its ruling upon the motions of the appellant, filed by him when he was returned for the purpose of preparing this record on appeal, seeking to correct the record as to his arraignment and to have the record recite that his attorney was absent from the court room when the jury returned its verdict. The record in the case shows that Judge Murphree, who presided when he was arraigned and tried, is dead, but other witnesses were present and testified upon these motions that the appellant's attorney was present when the verdict was received, and testified very clearly that the appellant waived his right to have counsel present at his arraignment. The record shows in the case that the appellant is not a novice in the court room, but that, on the contrary, he has been in court previous to that time, dating as far back as 1932, as shown by the appellant's own testimony; that, as a matter of fact, on this particular charge he was arrested in California and he resisted being returned for trial in Alabama, but after a hearing he was returned, and at the time of his arraignment his sister and professional bondsmen were present. Moreover, when appellant's case was originally called for a hearing by this court, we were informed that he had then forfeited his bond and was a fugitive from justice. When he was finally apprehended and returned, he was permitted to establish his bill of exceptions and perfect this appeal. We mention these circumstances simply for the purpose of showing that he is not an uneducated or illiterate person. He entered a plea of not guilty and it was a month before he was placed on trial, at which time he had counsel of his own choosing. He denied waiving his right to have counsel and denied that his counsel was present when the jury returned its verdict, but upon the conflicting testimony on these issues, the court below found the facts against him, and in this finding we agree with the court. The trial court was fully justified in so finding, and the court committed no error, be-

cause it is well settled that a defendant is entitled to the presence of counsel at all stages of the trial unless he waives it. House v. Mayo, 324 U.S. 42, 65 S.Ct. 517, 89 L.Ed. 739; Williams v. Kaiser, 323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398; Tomkins v. Missouri, 323 U.S. 485, 65 S.Ct. 370, 89 L. Ed. 407; Van Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316. This right to have the presence of his counsel can be waived if intelligently done. Authorities supra. All the facts and circumstances in this record, including the finding of the trial court, make it clear that he intelligently waived his right to have counsel present at his arraignment, and that his counsel was present when the verdict of the jury was received.

We have examined this record carefully and considered all errors assigned, although not raised, and those saved at the hearing and conclude that all of the assignments of error are without merit and the judgment of the court below should be affirmed.

Affirmed.