UNITED STATES *v.* LEE.

*(Circuit Court, N. D. New York.* June Term, 1882.)

1. EMBEZZLEMENT—NATIONAL BANKING ASSOCIATION.

The first clause of section 5209 of the Revised Statutes provides for three distinct offences: *First,* embezzlement; *second,* abstraction; and, *third,* wilful misapplication of the moneys, funds, or credits of the bank by any president, director, cashier, teller, clerk, or agent of any association organized as a national banking association.

2. SAME—MISAPPLICATION—CONVERSION.

It was the intention of congress to make criminal the misapplication and conversion of the funds of national banking associations without regard to whether or not the party so misapplying received any of the funds or other advantage, directly or indirectly.

3. SAME—INTENT.

If it appears that the funds of the banking association have been abstracted or wilfully misapplied by defendant, he is precluded from denying that it was done with unlawful intent.

COXE, D. J., *(charging jury.)* The prisoner at the bar stands indicted for having done various acts in violation of section 5209 of the Revised Statutes of the United States, while he was acting as president of the First National Bank of the city of Buffalo. The indictment is framed under this section, and the effort on the part of the prosecution and the defence has been, on the one side, to establish the guilt, and, on the other, the innocence, of the defendant, having reference solely to the crimes there enumerated. Although it has been read in your presence many times, it seems to me important that at the outset of your deliberations you should understand

thoroughly the law as applicable to this case in its full scope and meaning. With that view, I desire to call your attention again to this section of the law:

"Every president, director, cashier, teller, clerk, or agent of any association, who embezzles, abstracts, or wilfully misapplies any of the moneys, funds, or credits of the association ; or who, without authority from the directors, issues or puts in circulation any of the notes of the association; or who, without such authority, issues or puts forth any certificate of deposit, draws any order or bill of exchange, makes any acceptance, assigns any note, bond, draft, bill of exchange, mortgage, judgment, or decree; or who makes any false entry in any book, report, or statement of the association with, intent, in either case, to injure or defraud the association or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association; and every person who with like intent aids or abets any officer, clerk, or agent in any violation of this section, shall be deemed guilty of a a misdemeanor," etc.

The defendant is indicted under the first clause of the section, which I have read. I do not understand that it is insisted upon either side that the subsequent parts of the statute are applicable in any view to the case before you. The first sentence, or rather the first clause, of this section provides for three distinct and separate offences: the crime of embezzlement, the crime of abstraction, and the crime of wilful misapplication of the moneys, funds, or credits of the bank. The defendant is not indicted for putting in circulation any of the notes of the association, or for issuing any certificate of deposit, drawing any order or bill of exchange, making any acceptance, assigning any note, bond, draft, bill of exchange, mortgage, judgment or decree without authority from the board of directors of the bank; nor is he indicted for making any false entry in any book or in any report. And, gentlemen, it may be proper at this time to call your attention to the fact—because the subject has been discussed somewhat by counsel—that he is not indicted because, while acting as president of the bank, certain of its customers, himself among the rest, borrowed from the bank more than 10 per cent. of the capital stock, in violation, as the prosecution insists, of section 5200 of the Revised Statutes; nor is he indicted for discounting the paper of his relatives and friends. Whatever views we may entertain as to the legality and propriety of such conduct, his action in this respect is not called in question by this indictment. I should, perhaps, say further that the defendant is not here charged with

crime in allowing his reserve funds to decrease or become less than the amount required by law, nor is he charged with wrecking the bank. The proof bearing upon all of these alleged infractions and violations of the law is important, however, upon the question of intent.

It is not necessary, in order to find the defendant guilty of any of the crimes charged, that you should find that the bank failed by reason of his acts. A cashier, president, or director of a national bank may abstract and misapply its funds without any disaster such as has been detailed in this case occurring to the bank. Bearing in mind, then, that this indictment is framed solely, as I understand it, under the first clause of the section quoted, and recurring to that clause for a moment, it will be perceived that it enumerates, as stated, three distinct and separate crimes. If upon this evidence you find the defendant guilty of any one of them; if you find that he has taken the funds of the bank in violation of law, no matter how small the amount may have been,—it is sufficient to sustain a verdict of guilty. These offences are stated disjunctively in the statute: "Any president, director, or cashier who embezzles," or "who abstracts," or "who wilfully misapplies." A casual reading of this section might induce an unobserving person to assume that the three words were synonymous, or nearly so; but there is a distinction to which I desire very briefly to call your attention. The crime of embezzlement is a species of larceny, and is applicable to the stealing of property by clerks, agents, servants, parties acting in fiduciary capacities, and, under this statute, by a president, cashier, or director of a national bank. In order to constitute this crime it is necessary that the property embezzled should come *lawfully* into the hands of the party embezzling, and by virtue of the position of trust he occupies to the person whose property he takes. It is distinguishable from the crime of larceny in this respect, that the property comes *lawfully* into his possession, and is unlawfully taken by him. In the crime of larceny, on the contrary, it is unlawfully taken and retained. The crime of abstraction, made so by the statute, applies to cases where one for his own benefit takes the property of another; but it is not necessary that any position of trust should exist between the parties; nor is it necessary that the property should come lawfully into the possession of the person abstracting it. The other crime is the wilful misapplication of the funds, credits, and money of the bank; and by the word "wilfully," the congress meant "designedly"—where one of the persons mentioned in the section *designedly* and knowingly misapplies the property of

the bank.   It is not necessary that the party who misapplies should derive any benefit from the transaction.   It was the intention of congress to make criminal the misapplication and the conversion of the funds of national banking associations, without regard to whether or not the party so misapplying received any of the misapplied funds, or other advantage, directly or indirectly.   If you come to the conclusion that the property, money, and funds of this bank were wilfully misapplied, it is not necessary, in order to establish guilt, that any benefit should have come to this defendant; and that view of the statute is borne out by a reference to the subsequent sentence in it having reference to intent, to which I will call your attention more particularly in a moment.   It provides that these acts must, each of them, be done with intent to defraud or injure the association. When the word "defraud" is used, it necessarily implies that advantage comes to the party defrauding, and corresponding damage to the party who is defrauded; but the word "injure" has no such application.   That word is used in designating an injury which may come to the party whose property is taken, without any reference to whether the party who converts if is benefited or not.   This, then, gentlemen, is the statute under which the defendant is accused.   He stands indicted here by a pleading containing many counts, twelve in all, charging him with various offences.   To the indictment he has interposed a plea of not guilty.   He has pleaded a general denial, and that throws upon the prosecution the burden of proving beyond a reasonable doubt that he has been guilty of one of the offences charged; not all of them, but one of them.

It is proper that I should call your attention to the well-known rule of criminal law that every man is presumed innocent until the contrary is proved; and it is also proper that I should say that if, upon this evidence, there is a reasonable doubt in the mind of any one of you as to the guilt of the defendant, it is your duty to give him the benefit of that doubt.   In this case, as in most criminal cases, the essence of the offence, or that which makes it criminal, is the intent with which it is done.   The statute which I have read to you is explicit on this subject; and, as I have said, in order to find the defendant guilty, it is necessary that you should find that the acts complained of, the offences charged, were committed with the intent to defraud or injure the association.   But, having said that, I desire also to say to you emphatically that the law presumes that every man intends the legitimate consequences of his acts.   It will not do for a man to commit

an unlawful act, knowing that it is unlawful, and then assert that he did it with an innocent intent. If the evidence is susceptible of two constructions, the one pointing to guilt and the other to innocence, it is your duty to give that construction to it which is compatible with the innocence of the defendant. But if you are convinced that an unlawful act has been done; if, upon this evidence, you are satisfied beyond a reasonable doubt that the funds of this association have been embezzled, abstracted, or wilfully misapplied by this defendant,—then he is precluded from denying that he did it with guilty intent. Upon this question of intent you have a right to take into consideration all of the other alleged illegal transactions which have been mentioned, and to which I alluded some time ago as not included in this indictment, for the purpose of throwing light upon the acts of the defendant which are directly in issue. You have, upon the other hand, a right to take into consideration the evidence of his previous good character. I do not know, gentlemen, that it is necessary for me to dwell longer upon the law as applicable to this case.

Coming now to facts, I shall detain you but a few moments. After the exhaustive and able arguments to which you have listened, where every one of these transactions has been thoroughly and carefully discussed, it is neither necessary nor is it proper that I should attempt an extended presentation of the facts. The questions arising on the facts are to be decided by the jury; the court has but little to do with them. If I entertained an opinion as to the guilt or innocence of the accused it would be improper for me to express it in your hearing. It is for you to decide this question upon the proof, to sift the evidence, and by your verdict say where the truth is. In endeavoring to arrive at a correct conclusion it is sometimes well to take those facts which are conceded, undisputed, or incontestably proved. Starting with these facts, a jury desiring to arrive at the truth often receives an impulse which will lead to a correct conclusion. In other words, to use an illustration, a traveler, anxious to reach a certain point, by noting well the land-marks along his course while it is yet straight, can often obtain sufficient *data* to enable him to take the right direction when he reaches that point where the paths diverge.

It is undisputed that the First National Bank of Buffalo was a national banking association, created under the laws of the United States; that on the tenth day of January, 1882, Reuben Porter Lee, the defendant, was elected president of the bank, and occupied that position until the fourteenth of April, when the bank closed its doors

and refused to honor the checks of its depositors; that Lee, during this time, was the largest stockholder of the bank, and when the bank closed, or immediately preceding that time, he held in his own name some 700 shares of its stock. It is also undisputed that Herman J. Hall was indebted to the bank in a sum amounting to some $204,000; and that upon the tenth of April, 1882, part of his indebtedness was overdue, and there was an overdraft which has been variously stated to be from twenty-one thousand to fifty thousand dollars. It is also undisputed that on that day an additional loan was made to Herman J. Hall of $200,000, his notes taken for that amount, without indorsement, and cashier checks issued to him for that sum; that with the proceeds of these checks $180,000 of indebtedness to the bank was paid, or assumed and pretended to be paid, and was so marked upon the books of the bank. It is also conceded that in the latter part of the year 1881, and in March, 1882, the defendant caused to be made reports of the condition of the bank, containing a statement of its resources and liabilities, calculated to inspire confidence in those dealing with it, the details of which you will remember.

We now reach a point where there is dispute; where two theories are advanced. The evidence naturally groups itself around three or four principal transactions, to which the attention of counsel on either side has been directed. The principal one, without question I think, is the last operation with Hall. It is of that transaction that the learned district attorney predicates the main accusation against the prisoner.

The position of the prosecution is this: That upon the tenth day of April the defendant knowing that Hall was a debtor to the bank to the amount of nearly a quarter of a million dollars, and that he was worthless; knowing that the bank was hopelessly insolvent, and knowing that there was a personal liability upon every share of stock which he held, transferred his stock to Hall, and took out of the bank the paper upon which he was held as indorser, or upon which his friends or the members of his family were held, and cancelled all of this indebtedness. That Lee, in connection with Hall, devised this scheme, which the prosecution insist was a grossly fraudulent scheme, arranged by them for the purposes indicated; and that by this means $180,000 of the paper of the bank, which is presumed to have been good, and upon which the face value could have been realized, was taken out of the bank and wilfully misapplied and abstracted. That is the charge on the part of the prosecution.

For ьhe defendant it is argued that, in the latter part of the year 1881, he was severely sick with a brain difficulty, and remained in that condition a week or 10 days; that when he came again to the bank he found himself unable to continue the business with safety to his health, and after making various efforts to induce Hall to reduce his line of discount, he at last told him (Hall) that he must close up his Chicago business, and pay the proceeds upon his indebtedness, or induce his friends to take charge of the bank at Buffalo; and that it was with the intention of placing the bank and its affairs in the hands of another and more responsible board of directors, and for the purpose of enabling Hall to manage the affairs of the bank to suit himself, and reduce his line of discount, that this transaction was entered into.

The evidence bearing upon these two theories you will keep in mind, and you will say upon the evidence which is the natural and fair one to adopt. If you find that this was a fraudulent device for the purpose of abstracting and misapplying the collectible paper of the bank; if you find that it was a scheme on the part of the defendant to discharge himself and his relatives from all liability to the bank upon the paper and upon the stock,—then, gentlemen, the, indictment should be sustained and a verdict of guilty rendered. If upon the contrary, you can believe the version stated here by the defendant to be the correct one, the verdict should be not guilty:

Another transaction, to which the counsel have called your attention, is the purchase of the Vought stock. It seems that upon the eighteenth day of January, 1882, through Mr. John Otto, a stock-broker in Buffalo, the defendant purchased 152 shares of the capital stock of the bank. There is no dispute that the stock was paid for out of the funds of the bank. A draft was given by Lee, as cashier of the bank, upon its correspondent in New York, and the stock was paid for in that way. I do not understand that there is any dispute in the evidence about that. The stock was placed on the books of the bank in the name of the defendant. It seems that subsequently he sold various parcels of the stock, and upon his receiving pay for it he applied the amounts upon his indebtedness to the bank, which was carried along in the shape of an overdraft. But it is undisputed that there was a balance of some $12,000 which was not paid by any sale of the stock, and which was an indebtedness existing at the time the bank closed its doors, and was taken up or assumed to be paid for by this alleged Hall discount upon the twelfth day of April, 1882. Upon the part of the defendant it is said that this transac-

tion was entered into for the purpose of getting an unfriendly stockholder out of the bank, and that the stock was taken in the name of Lee simply for convenience.

One of the other transactions is that with O. C. Read. It appears that a note of the bank was made for the purchase of some telephone stock. The stock was subsequently bought by Lee and put up as collateral security for the note. When the stock was sold at different times, Mr. Read came to the bank and paid the proceeds of the sale to Lee, who indorsed them on the back of the note, and they appear there in his handwriting. There is no evidence that these amounts were ever paid directly to the bank. On the contary the evidence is that they were credited to Lee upon his private account with the bank, and retained by him. This note of Read was included in the number of notes that were taken up on the 12th by the alleged proceeds of the Hall discount. The defendant says that he did not pay this money to the bank for the reason that the note was not due, and to have done so would have been out of the usual course of business; that he intended to pay it when the whole amount of stock was sold. But in this connection you will remember that the note was payable on demand.

The other transaction which has been discussed was with Mr. Bull. The defendant went to Mr. Bull a short time before the bank failed, and asked leave to sell him 200 shares of the capital stock of the bank, and thereupon he gave Mr. Bull credit in the books of the bank for one item of $40,000, and another of $10,000, and took Mr. Bull's check for various amounts, making up the sum of $50,000. Although the defendant says that he had the scrip in his pocket, and was ready to transfer it and then buy it back, it does not appear that there was any actual transfer of the stock made. It is said by the prosecution that this was one of the fraudulent devices resorted to at this time, when the defendant saw ruin staring him in the face, and when he was compelled to have recourse to these schemes to save himself and his friends, and that it was a fictitious transfer made for the purpose of covering up his methods in disposing of the funds and property of the bank. Upon the part of the defendant it is alleged that it was a harmless arrangement, and was entered into for the purpose of conveying to Hall the idea that the stock was coming from various parties, he having been told that the stock was owned by other parties, but that Lee could control it.

These are the transactions referred to and discussed by the counsel. You have heard all the proof bearing upon them. It is your duty to

apply the rules of law suggested to the evidence, and say upon the whole case whether or not the defendant is guilty. It is not a case for sympathy. You are empanelled to do your duty in the case, and if you find that the defendant is guilty, it is your duty to say so fearlessly, without reference to the consequences; without reference to any sympathy that may be felt by you for him, or for any one connected with him.

And now, gentlemen, I leave the case with you with the firm belief that you will render a fair and righteous verdict, and a true deliverance make between the government and the prisoner at the bar.