**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Rex Stidham WINDOM, Defendant-Appellant.**

**No. 74–2935.**

United States Court of Appeals, Fifth Circuit.

April 7, 1975.

Rehearing and Rehearing En Banc Denied June 2, 1975.

---

Harry E. Claiborne, Las Vegas, Nev., for defendant-appellant.

Gerald J. Gallinghouse, U. S. Atty., Robert L. Livingston, Mary W. Cazalas Asst. U. S. Attys., New Orleans, La., for plaintiff-appellee.

Before THORNBERRY, COLEMAN and ROSENN *, Circuit Judges.

COLEMAN, Circuit Judge.

Rex Windom appeals his conviction of publishing and uttering as true eight government checks bearing forged endorsements knowing the endorsements to have been forged.[1] We affirm.

The direct evidence against Windom was supplied by three witnesses—Raymond Starns, James Maxwell, and George Boyd.

### Starns' Testimony

At the time of the trial, Raymond Starns was serving a sentence in federal penitentiary arising out of some ·of the same criminal activities with which defendant was charged. Starns testified that in February of 1972 he was attempting to sell his bankrupt business, the Mechanical Maintenance and Manufacturing Company. On February 16, 1972, a business associate introduced him to the defendant. Windom represented

* Of the Third Circuit, sitting by designation.

1. The first count of the indictment reads:

Count I

That on or about the 16th day of February, 1972, at Denham Springs, Louisiana, in the Eastern District of Louisiana, Rex Stidham Windom and Raymond Starns having obtained possession of a genuine obligation of the United States, to wit, a United States Treasurer's Check No. 6287421, dated February 1, 1972, and payable to Tri-State Motor Transit Company in the amount of $10,394.42, did then and there utter and publish as true and genuine a false and forged writing, that is, the falsely forged endorsement of Tri-State Motor Transit Company on the back of said check, with intent to defraud the United States, well and truly knowing the said writing to be false and forged; all in violation of Title 18, United States Code, Section 495 and Section 2.

There were seven additional counts, identical to the first, except for the check number.

18 U.S.C. § 495, Par. 2, is the statute under which defendant was indicted. It reads:

Whoever utters or publishes as true any such false, forged, altered, or counterfeited writing, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited;

\* \* \* \* \* \*

Shall be fined not more than $1,000 or imprisoned not more than .than ten years, or both.

himself to be George Boyd, President of the prosperous Missouri corporation, Tri State Motor Transit. He told Starns that he was planning to invest in a Louisiana business and might be interested in buying the Mechanical Maintenance and Manufacturing Company.

During the discussion of the proposed sale, defendant told Starns that he wanted to open an account in a Louisiana bank. Starns recommended the First National Bank of Denham Springs, where he did his banking business, and agreed to take Windom to that bank.

When they got to the bank, Starns and Windom talked with James Maxwell, the bank president. Defendant again represented himself to be George Boyd, and explained his desire to open an account. To open the account, he produced eight U. S. Government checks, made out to Tri State Motor Transit, the Missouri corporation he claimed to represent. Since defendant said he did not have the company's stamp with him, Maxwell had Tri State's endorsement typed on the checks. The representation that the endorsements were true and authorized is the criminal act for which Windom stands convicted.

Starns testified that he and defendant had two other meetings for the purpose of discussing the proposed Mechanical Maintenance sale. One occasion was a brief meeting at a Baton Rouge coffee shop. The other took place at the offices of Starns' attorney. The law office meeting was the occasion on which Windom first drew on the account he had fraudulently established in the Denham Springs Bank. He drew a $35,000 check, gave it to Starns, who gave it to one of the lawyers, who, in turn, gave it to a secretary for cashing. The secretary returned with the cash; defendant put it in his briefcase.

The meeting ended with no finalization of the sale of the business. Starns drove defendant to the airport. On the way, for reasons left unclear by Starns' testimony, defendant gave Starns $5000 in cash, plus some checks which Starns later discovered to have been stolen.

Contact between Starns and defendant terminated with their arrests.

### Maxwell's Testimony

James Maxwell, President of the Denham Springs First National Bank, corroborated Starns' testimony to the effect that defendant had come to the bank, had represented himself to be George Boyd, and had deposited the government checks made out to Tri State Motor Transit. He testified that he had cashed a $35,000 check signed "George Boyd", delivered by the secretary. He further testified that Starns had given him a $110,000 check signed "George Boyd". The $110,000 check was payable to another bank and was drawn for a transfer of funds. He honored this fraudulent check, but the money was recovered.

### George Boyd's Testimony

The real George Boyd testified that he is president of Tri State Motor Transit, that he does all his banking in Missouri, that he has never been in Denham Springs, Louisiana, and that he does not know how the defendant obtained the government checks made payable to his company.

### The Appellate Arguments

Defendant makes no claim that the above recited evidence is insufficient to sustain the conviction. Instead, he urges various alleged evidentiary, procedural, and instructural errors:

I. Did the Judge err in admitting evidence supplementing facts stated in a written stipulation?

The government took a handwriting specimen from defendant. It had an F.B.I. handwriting expert compare this handwriting with the signatures on checks and other documents signed by the person calling himself "George Boyd". The government hoped to show that the individual who had signed the checks as "George Boyd" was the defendant.

The handwriting expert could reach no definite conclusion as to whether or not

the signatures on the checks were made by defendant. Consequently, the government and the defendant entered the following stipulation:

"[O]n the basis of the analysis and comparison, it was not determined that the handwriting on the exhibits was the handwriting of Rex Windom."

Some time prior to the trial, the government advised Windom's counsel that it planned to call its handwriting expert to testify. The government attorney specifically invited defense counsel to question the expert so that he would be prepared to cross examine. The invitation was declined.

At the trial, over objection, the handwriting expert testified in detail about the procedures used in signature analysis. He further testified that although he had formed no conclusion, the defendant possibly "could have" signed the checks.

Defendant says the admission of the expert's testimony was reversible error since "a written stipulation may not be commented on, nor testimony taken, once the parties have agreed to the stipulation".

How this factor was allowed to creep into the case seems incomprehensible. Windom was not on trial for uttering handwritten endorsements. The charge was that he had falsely represented himself to be the president of the company to whom the checks were issued and had falsely represented that he had authority to cause typewritten endorsements to be affixed to the checks. That he did cause the endorsements to be typed on the checks was proven by the eye witness testimony of both Starns and the bank president. If it can be said that the forgery of the real Boyd's signature on checks drawn on the account would tend to show that Boyd was guilty of the original forgery, the answer is that the forgery had already been proven by direct, rather than secondary evidence, as had the delivery of the $30,000 check to the attorney.

On the other hand, we are equally skeptical that the episode in any way prejudiced Windom. The testimony of the witness did not contradict the stipulation. Indeed, it confirmed it. It nailed down the proposition that the handwriting expert could not conclude that Windom did the handwriting in question. This should have been to Windom's advantage. True, the witness was allowed to say that Windom could have done it, but that was not what the case was about. The issue was, did he utter forged typewritten endorsements? Furthermore, defense counsel had been on adequate notice that the handwriting expert would be called to testify.

■ In view of the eye witness testimony, in view of no contradiction of the basic premise of the stipulation, in consideration of the fact that the expert witness admitted that he could not say that the writings were Windom's, and in further consideration that defense counsel knew all along that the expert was going to be called to testify, our appraisal of this skirmish is that if error existed it was harmless beyond a reasonable doubt.

■ We are similarly unimpressed by appellant's complaints concerning the instructions of the Court which conceded, although unnecessarily, that the government would have to prove by the evidence beyond a reasonable doubt that Windom had "obtained possession of a genuine obligation of the United States." The indictment charged this, but this was pure surplusage. The offense was uttering a forgery, not possessing a stolen government check. The end result of all this is that the government assumed and, by the instructions of the Court, was required to carry a burden which was not properly assignable to it. Instead of being prejudiced, Rule 52, Fed.R.Crim.P., the defendant was handed a windfall. It was a sham issue in any event. Obviously, the defendant had to come into the possession of the checks, else he could not have offered them to the bank president.

■ The assignment about the instruction on aiding and abetting, 18

U.S.C. § 2,[2] must be consigned to a similar fate. The appellant argues that this instruction was wholly improper because there was no evidence that Windom aided another to commit the offense charged; in other words, by the government's proof, Windom was himself the principal. Even so, Starns had testified that on one occasion prior to the time he and Windom deposited the government checks in the Denham Springs bank, he, Starns, the close associate of Windom in depositing the checks, had deposited $300,000 in stolen U. S. Treasury notes in the same bank as collateral for a loan he was arranging for some associates. This testimony could have given rise to an inference, if the jury saw fit to accept it, that if Windom was not acting on his own behalf when he deposited the checks he was aiding and abetting Starns in his various activities associated with stolen government checks and securities.

■ The appellant additionally complains of the failure of the District Court to give the customary accomplice instruction, that such testimony must be received with great caution. The problem with this is that the defense requested no such instruction, so the point is of no moment unless it amounted to plain error. The failure to give such an instruction where the testimony of the accomplice is the only direct evidence against the accused *is* plain error, Tillery v. United States, 5 Cir., 1969, 411 F.2d 644; Williamson v. United States, 5 Cir., 1964, 332 F.2d 123.

■ To the contrary, in a case where the defendant was convicted on the uncorroborated testimony of *two* convicted accomplices we declined, in the absence of a close evidentiary situation, to reverse for failure to give a cautionary instruction, United States v. Clark, 5 Cir., 1973, 480 F.2d 1249.

■ We are next met with the assertion that the trial court should not have charged the jury in the following language:

The writing of a payee's endorsement on a United States Treasury Check by any person other than the payee, if done willfully and without authority, and with intent to defraud, constitutes a forgery within the meaning of Section 495 of Title 18 of the United States Code.

We agree with what the 8th Circuit said in Cummings v. United States, 8 Cir., 1968, 398 F.2d 377, 382: the reference to forgery was merely explanatory of the actual charge, uttering the forgery, and in giving the instruction the trial court did not submit an additional charge not contained in the indictment.

■ Finally, we are told that the District Judge committed reversible error when he declined to declare a mistrial after the prosecutor in the course of argument referred to the defendant as a "con artist". We resist the temptation to present a recapitulation of the many cases dealing with this subject. In general, prosecuting attorneys are no longer permitted to indulge themselves, or their audiences, in unrestrained, abusive histrionics, giving their personal evaluations of what a low-down fellow the defendant really is. Nevertheless, the law remains that unflattering characterizations of a defendant will not provoke a reversal when such descriptions are supported by the evidence. See, e. g., Walker v. Beto, 5 Cir., 1971, 437 F.2d 1018, in which the prosecutor referred to the appellant as a "professional criminal."

■ Appellant complains that since all eight checks were uttered at the same time to the same recipient he should not have been prosecuted, convicted, and sentenced on eight counts, charging each check as the basis for an

---

**2.** 18 U.S.C.A. § 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

individual count. We disagree. Each check was a separate document, requiring a separate endorsement, and thus was uttered individually. Besides, the appellant received concurrent sentences. See United States v. Hale, 5 Cir., 1972, 468 F.2d 435, which deals with both aspects of this argument.

Affirmed.

ROSENN, Circuit Judge (concurring).

Although I concur in the majority's affirmance of defendant's conviction, I would vacate his sentence and remand for sentencing on only one count.

The statute under which defendant was convicted provides in part:

> Whoever utters or publishes as true any such false, forged, altered, or counterfeited writing, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited [shall be fined or imprisoned].

18 U.S.C. § 495 (1970). The Government relies upon the word "any" in the statute for its contention that each check uttered constituted a separate offense. I believe this reliance is misplaced. The representation that the check endorsements were true and authorized constituted only a single transaction, and thus only one offense.

In United States v. Driscoll, the defendant was convicted on six counts under a statute making it unlawful to cause the interstate transportation of "any falsely made, forged, altered, or counterfeited securities . . .." 454 F.2d 792 (5th Cir. 1972); 18 U.S.C. § 2314 (1970). Although six checks were placed in evidence, the defendant passed these checks on only three separate occasions. 454 F.2d at 801. The court concluded that only three violations of section 2314 occurred and the Government apparently so conceded. *Id.*

The Supreme Court's decision in Bell v. United States, although dealing with a criminal statute in a different substantive area, lends strong support to the position adopted in *Driscoll*. 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955). The defendant in *Bell* was convicted of two counts under the Mann Act for transporting two women on the same occasion. The Mann Act provides in part:

> Whoever knowingly transports in interstate or foreign commerce . . . any woman or girl . . . ..

18 U.S.C. § 2421 (1970). The Supreme Court held that only one offense had been committed.

It is not to be denied that argumentative skill, as was shown at the Bar, could persuasively and not unreasonably reach either of the conflicting constructions. About only one aspect of the problem can one be dogmatic. When Congress has the will it has no difficulty in expressing it—when it has the will, that is, of defining what it desires to make the unit of prosecution and, more particularly, to make each stick in a faggot a single criminal unit. When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity. And this not out of any sentimental consideration, or for want of sympathy with the purpose of Congress in proscribing evil or antisocial conduct. It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment. This in no wise implies that language used in criminal statutes should not be read with the saving grace of common sense with which other enactments, not cast in technical language, are to be read. Nor does it assume that offenders against the law carefully read the penal code before they embark on crime. It merely means that if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses, when we have no more to go on than the present case furnishes.

349 U.S. at 83–84, 75 S.Ct. at 622.

I am unable to distinguish the present case from either *Driscoll* or *Bell.* Both

section 495 which is involved here and the statutes construed in *Driscoll* and *Bell* contain the word "any" in the same syntactical context. As was the statute in *Bell,* section 495 is criminal in nature. Thus, because we are confronted with an expression of congressional intent no more clear than in *Bell,* we should resolve the ambiguity concerning punishment "in favor of lenity" and hold that defendant committed only one offense.

Because defendant could have been convicted of but one offense, the district court erred in sentencing him under each of the eight counts. The majority, however, would treat any such error as harmless since the sentences pronounced by the district court are to run concurrently. I cannot agree that the error in sentencing was harmless.

The so-called concurrent sentence "doctrine," if it ever was recognized, has been eroded substantially in recent years. The Supreme Court decided in Benton v. Maryland that concurrent sentencing on multiple counts does not preclude, as a matter of jurisdiction, consideration of errors alleged on one count if another count leads to a valid conviction. 395 U.S. 784, 787–91, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

> It may be that in certain circumstances a federal appellate court, as a matter of discretion, might decide (as in *Hirabayashi*) [320 U.S. 81 (1943)] that it is "unnecessary" to consider all the allegations made by a particular party. The concurrent sentence rule may have some continuing validity as a rule of judicial convenience.

*Id.* at 791, 89 S.Ct. at 2060 (footnote omitted).

In the Fifth Circuit, one line of cases has employed the "discretionary" concurrent sentence rule since *Benton.* United States v. Hendrix, 487 F.2d 893 (5th Cir. 1973) (per curiam); United States v. Lee, 483 F.2d 968 (5th Cir. 1973) (per curiam); United States v. Payne, 467 F.2d 828 (5th Cir. 1972); United States v. Dumenigo, 444 F.2d 253 (5th Cir. 1971) (per curiam); United States v. Varner, 437 F.2d 1195 (5th Cir. 1971) (per curiam).

Only *Varner* cites *Benton.* 437 F.2d at 1197. Other cases in the Fifth Circuit, however, have held that concurrent sentencing does not cure conviction on more than the permissible number of counts. United States v. White, 440 F.2d 978, 981 & n. 4 (5th Cir. 1971); Holland v. United States, 384 F.2d 370, 371 (5th Cir. 1967) (pre-*Benton*); *see* United States v. Mori, 444 F.2d 240, 245 (5th Cir. 1971) (dictum).

I agree with Judge Goldberg, writing in *Driscoll,* that multiple sentencing is prejudicial. 454 F.2d at 801.

> [S]everal sentences arising from what should have been a lesser number of offenses, even if the sentences are concurrent, would be prejudicial to the defendant by reducing his opportunities for earlier parole or pardon . . . ..

*Id.* This harm was recognized prior to *Driscoll* in the *White* and *Holland* cases, *supra.*

I would vacate the sentences imposed by the district court and remand the case for resentencing on one count.